PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3567
_____

MICHAEL MCKENNA;
WILLIAM K. MCKENNA;
RAYMOND CARNATION,
                                    Appellants
v.

CITY OF PHILADELPHIA

_____

No. 10-3430
_____

MICHAEL MCKENNA;
WILLIAM MCKENNA;
RAYMOND CARNATION

v.

CITY OF PHILADELPHIA,
                                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-98-cv-05835, 2-99-cv-01163)
District Judge:  Honorable Mary A. McLaughlin
_____

No. 09-3567 Submitted Pursuant to 3rd Cir. LAR 34.1 on
July 11, 2011

No. 10-3430 Argued July 11, 2011

Before: SLOVITER, FUENTES, and VANASKIE,
Circuit Judges

(Filed: August 17, 2011)
_____

Brian M. Puricelli   (Argued)
Law Offices of Brian Puricelli
Newtown, PA  18940

        Attorney for Appellants/Cross-Appellees

Eleanor N. Ewing   (Argued)
City of Philadelphia Law Department
Philadelphia, PA  19102

Mark J. Foley
Dexter R. Hamilton
George A. Voegele, Jr.
Cozen O'Connor
Philadelphia, PA  19103

        Attorneys for Appellee/Cross-Appellant

_____

OPINION OF THE COURT
_____

SLOVITER, *Circuit Judge*.

        In *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1189
(2011), the Supreme Court addressed "the circumstances
under which an employer may be held liable for employment
discrimination based on the discriminatory animus of an

2

employee who influenced, but did not make, the ultimate employment decision." Today we consider, in light of *Staub*, whether the City of Philadelphia, the employer at issue, has demonstrated that its internal disciplinary review hearing severed the causal connection between a supervisor's retaliatory animus and the employer's ultimate employment decision to terminate the employee. The procedural posture of this case appears in the margin,[1] which disposes of the

---

[1] This case came to trial as a Title VII claim filed by three terminated police officers, William McKenna, his brother Michael McKenna, and Raymond Carnation, each of whom alleged that they were disciplined in retaliation for protesting the discriminatory treatment afforded their African American colleagues. Their cases were consolidated for discovery and trial.

The jury found in favor of the plaintiffs, specifically that William McKenna proved that the discipline he received resulting from the comment that "Sergeant Moroney should be shot in the head" was retaliatory, that the number of sick checks William received was retaliatory, and awarded him $3,000,000 in damages; that Michael proved that the pattern of conduct against him was retaliatory, and awarded him $5,000,000; and that Raymond Carnation proved that the pattern of conduct directed against him was retaliatory and awarded him $2,000,000. App. at 753-57.

The District Court applied the compensatory damages cap of Title VII to reduce the jury's award to $300,000 per plaintiff. In a thorough and well-reasoned 108-page opinion, the District Court denied the plaintiffs' post-trial motion, which challenged, among other things, the Court's conclusions that: the McKennas had failed to plead their wrongful termination claims; the plaintiffs had failed to plead claims under the Pennsylvania Human Relations Act ("PHRA"); the City had not impliedly consented to try PHRA claims; the Court properly imposed the statutory cap of Title VII because there were no PHRA claims to absorb the excess above the statutory cap; and that the Court had not erred in

issues raised in No. 09-3567.  We limit this opinion to the issues raised in the City's cross-appeal, No. 10-3430.

## I.

Ray Carnation, who is Caucasian, worked as a police officer in the Philadelphia Police Department until the City of Philadelphia terminated him in 1999.  He filed a Complaint against the City, asserting that it terminated him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in retaliation for his opposition to the City's racially discriminatory treatment of minority officers.

At trial, the evidence established that Carnation worked in the 7-squad of the 25th District of the Philadelphia Police Department, over which Captain William Colarulo assumed command in 1997.  Shortly thereafter, Sergeant John Moroney, who had been one of the rotating supervisors of the 7-squad, was made permanent supervisor.

---

determining Carnation's equity award based on his termination.

On appeal, plaintiffs challenge the District Court's opinion.  After carefully reviewing the parties' submissions and the extensive record, we conclude that the District Court did not err or abuse its discretion.  We agree with the District Court.  Substantially for the reasons set forth in that excellent opinion, we will affirm the Court's judgment as to the plaintiffs' appeal.

Plaintiffs also argue on appeal that the District Court erred in deferring any determination of an award of attorney's fees and costs.  We find this remaining argument without merit and not in need of a separate discussion.  Accordingly, we will affirm the District Court's judgment with respect to the plaintiffs' appeal. The Court may consider on remand plaintiffs' attorney's fee petition.

4

Carnation testified that there were racial tensions within the 7-squad before Moroney assumed control, and that Carnation brought the problem to Moroney's attention. Carnation also complained on numerous occasions to Colarulo about racial tensions in the 7-squad. When things did not change, Carnation told Colarulo that he thought Moroney was condoning racism within the squad by failing to address the issue. Carnation also told Moroney that he was contributing to the problem by failing to take any action.

Carnation claimed that, after making these complaints, he, along with minority officers and other officers who complained of racism, was assigned unassisted duty in dangerous neighborhoods in unpleasant weather conditions, particularly rain and cold. When Carnation reiterated his concern that Moroney was condoning racism, Colarulo told him that if he made an EEOC complaint, Colarulo would make Carnation's life "a living nightmare." App. at 2022. Colarulo ordered Carnation to apologize for making the accusations.

Carnation claims that as a result, he suffered extreme anxiety and depression, and was placed on restricted duty out of the 25th District in May 1998. Shortly after his transfer, on the Friday before Memorial Day weekend, Carnation made at least two telephone calls to the 25th District, seeking to speak with Moroney. According to Carnation, Colarulo called him back and exclaimed "[w]ho the fuck do you think you are calling Sgt. Moroney at the District?" App. at 2055. After a brief discussion, Colarulo ordered Carnation to "not call Sgt. Moroney." App. 2054 Carnation testified that he understood Colarulo to mean that he should not attempt to reach Moroney for the rest of that day.

The next day, a Saturday, Carnation called the 25th District and spoke with Moroney about his concerns. On Sunday, Carnation called Colarulo, who was off duty, at around 8:30 in the morning at his shore house. Carnation testified that he called to inform Colarulo that he had reached Moroney and had resolved many of his concerns, but that he

5

still wanted to schedule a meeting among the three of them. Colarulo declined the request, telling Carnation that "he doesn't conduct meetings in that fashion." App. at 2030-31. Colarulo thereafter served Carnation with disciplinary papers for his Memorial Day calls.

Colarulo brought, or "preferred," against Carnation two counts of insubordination, based on his purported "refusal to obey proper orders from superior[s]" and "us[e of] profane or insulting language to a superior officer," and one count of neglect of duty, based on his alleged "failure to comply with any commissioner's orders, directives, regulations, etc., or any oral or written orders of superiors." App. at 3527-31. Colarulo recommended that the matter be adjudicated by the Police Board of Inquiry ("PBI").

Colarulo testified at trial as to the process for bringing charges against officers in 1998 and 1999. He stated that he would complete an investigation and determine that disciplinary action was warranted. Then, Colarulo would submit the charging papers, also known as "18s,"[2] to the charging unit of the PBI via his chain of command. Colarulo "d[id not] know how many signatures would be required," but stated that whatever the method, "eventually it does go to the [PBI]." App. at 2821. The 18s against Carnation were signed by Colarulo, the Division Commander, the Chief Inspector, and the Deputy Commissioner.

Carnation was permitted to either plead guilty and waive a hearing, or plead not guilty and request a hearing. As indicated on the 18s, Carnation pled not guilty and requested a hearing before the PBI. Colarulo characterized the adjudication arm of the PBI, before which hearings were held, as "completely separate" from the charging unit of the PBI. App. at 2823. He characterized the adjudication unit as

_____

[2]The term "18" is short for document number 75-18, which gives notice to the charged person of the charges against him or her, the basis for the charges, and the action being taken.

6

"similar to a military court marshal." App. at 2783. He elaborated:

> [W]hen a officer is disciplined, they go before this board and there's always one person of the same rank as the officer and then there would be a captain and a lieutenant that sits on that board as well. The City will -- or the Police Department will present their case. The officer will have representation, legal representation with them, and they're able to cross examine, similar to a courtroom, and it's basically done at the Round House[3] and then, after testimony is taken, that three-person board will mediate and decide what the appropriate finding is, guilty, not guilty, or so forth.

App. at 2783.

More concisely, the PBI adjudication unit is "a three-person panel that listens to the evidence and then decides the proper sanction" to recommend. App. at 2794. Its authority is limited to recommending sanctions. The power to impose sanctions lies with the Commissioner.

Colarulo informed Carnation that the hearing itself would be confidential. The notice to Carnation regarding the PBI hearing also informed him that he had the right to counsel. By signing it, Carnation acknowledged that Colarulo had advised him of his right to have counsel of choice present at the hearing and that the absence of counsel would not be a ground for a continuance and would be deemed a waiver of the right to counsel's presence.

---

[3]The "Round House" is the popular name for the headquarters of the Philadelphia Police Department, originally from the architectural form of the building. Counsel for Carnation explained at oral argument that the hearing is held in the basement of the Round House.

7

Although Carnation, like other members of the Police Department, is ordinarily represented by the Fraternal Order of Police, which serves as the collective bargaining agent for Philadelphia police officers, it did not represent him before the PBI. According to Carnation, the Fraternal Order of Police declined to represent him at the hearing because it felt that the discord was "a big personality conflict." App. at 2061. Carnation apparently secured private counsel to represent him at the PBI hearing, and he testified on his own behalf. Colarulo also testified for the City, in addition to other witnesses.

The PBI that considered the charges against Carnation consisted of a police officer, a lieutenant, and a captain. After the hearing, which took place about six months after Carnation was charged and lasted just over three hours, the PBI found Carnation guilty of the charges preferred by Colarulo. Acting within its authority, it also added a charge against Carnation for conduct unbecoming an officer, based on its finding that Carnation engaged in "[r]epeated violations of departmental rules and regulations, and/or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the Police Department." Supp. App. at 633.

The PBI did not give Carnation any notice that it was contemplating adding a charge after the hearing.[4] Based on the four charges for which it found Carnation guilty, the PBI

---

[4]It is unclear from the record, and indeed it was unclear to Carnation, what formed the basis of the charge for conduct unbecoming an officer. Carnation testified that he was under significant stress at the time and that the initial charges "kind of took [him] over the edge." App. at 2036. Acknowledging to himself that he was "having some type of psychological problems," he admitted himself to a hospital where he was diagnosed as homicidal towards Colarulo and as suicidal. App. at 2037. At trial, Carnation seemed to speculate that the added charge stemmed from his homicidal tendencies diagnosis. He referred to the charge as one for "tr[ying] to kill a commanding officer." App. at 2060.

recommended Carnation's dismissal. Shortly thereafter, the Commissioner gave Carnation notice of the City's intent to terminate him.

Following the PBI proceedings, which were the subject of testimony before the jury at the Title VII trial, the jury returned a verdict for all three plaintiffs. With respect to Carnation, the jury found that Carnation had proven by a preponderance of the evidence that "the discipline he received for contacting his supervisors over the Memorial Day weekend was motivated by unlawful retaliation for his protesting the treatment of African-Americans or filing a claim of discrimination." App. at 756. The jury awarded Carnation $2,000,000 in compensatory damages, which the District Court reduced to $300,000, based on the compensatory damages cap of Title VII, 42 U.S.C. § 1981a(b)(3)(D). After an equity hearing on Carnation's termination, the District Court awarded Carnation $208,781 back pay, and $46,560 of pre-judgment interest on the back pay. The Court entered a total judgment in favor of Carnation in the amount of $555,341, representing the $300,000 in the Title VII case in addition to the equity award.

The City moved for judgment as a matter of law and/or notwithstanding the verdict on Carnation's termination claim. It argued that although Carnation was terminated as a result of disciplinary proceedings brought by Colarulo, Carnation had failed to establish the requisite causal link between his termination and Colarulo's alleged retaliatory animus because the termination recommendation was made by an "independent" PBI. Supp. App. at 536. The City emphasized that the PBI added a charge *sua sponte* against Carnation and that he had not presented any evidence to permit the inference that the PBI itself was motivated by retaliatory animus.

The District Court denied the City's motion for judgment as a matter of law and/or notwithstanding the verdict. In doing so, the Court evaluated the evidence in the light most favorable to Carnation and concluded that the jury was entitled to credit Carnation's testimony and find that Colarulo was motivated by an intent to retaliate against him.

9

With respect to the PBI, the Court determined that the jury had no basis upon which it could find that the PBI itself was motivated by retaliation. The Court held, however, that there was sufficient evidence upon which the jury could impute to the PBI the retaliatory animus of Colarulo.

In so holding, the Court relied on this court's decision in *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001), in which we stated that "[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." Applying this test, the District Court in this case noted that "[v]ery little testimony was offered at trial by either side about the PBI's involvement in Carnation's termination." *McKenna v. City of Phila.*, Nos. 98-5835, 99-1163, 2010 WL 2891591, at *26 (E.D. Pa. July 20, 2010).

The Court concluded, however, that "[b]ecause the events of [Memorial Day] weekend formed the grounds for the disciplinary charges against [Carnation] and the proceedings before the PBI, a reasonable jury could find that Colarulo's animus played a substantial role in the ultimate decision by the PBI to recommend Carnation's termination." *Id.* at *31. The City appeals.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. This court has jurisdiction under 29 U.S.C. § 1291. We review the denial of judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to Carnation, the prevailing party. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009). This court will reverse only if the record is "critically deficient of the minimum quantum of evidence" upon which a jury could reasonably base its verdict. *Id.* (internal quotation omitted).

## III.

10

While this case was pending on appeal, the Supreme Court decided *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011), a decision directly relevant to the issues in the City's cross-appeal. We directed the parties to file supplemental memos on the effect of *Staub*.

In that case, Vincent Staub sued his former employer, respondent Proctor Hospital, under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.*[5] Staub alleged that his termination was motivated by Proctor's hostility to his obligations as a member of the United States Army Reserve, which required him to devote a certain number of weeks and weekends per year to training. Specifically, he claimed that although the vice president of human resources, who lacked such hostility, made the decision to terminate him, her decision was influenced by Staub's supervisors, who possessed enmity to his military obligations. *Id.* at 1190.

The Seventh Circuit characterized Staub's claim as a "cat's paw case,"[6] or one in which Staub sought to hold his

[5]The Supreme Court described USERRA as a statute "very similar to Title VII." 131 S. Ct. at 1191. USERRA provides that "[a]n employer shall be considered to have engaged in [prohibited] actions . . . if the person's membership . . . in the services . . . is a motivating factor in the employer's action." 38 U.S.C. § 4311(c). Likewise, Title VII prohibits employment discrimination "because of . . . race," among other grounds, and provides that the complaining party establishes an unlawful employment practice when it demonstrates that race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(a), (m).

[6]As explained by the Supreme Court in *Staub*, the term "cat's paw" derives from one of Aesop's fables. 131 S. Ct. at 1190 n.1. In the fable, a mischievous monkey compliments his company, a cat, on his abilities and suggests that the cat steal the chestnuts that they were watching roast in a fire. The naïve cat, flush with the monkey's flattery, readily

employer liable for the animus of a nondecisionmaker. *Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 2009). Under Seventh Circuit precedent, an employer would be held liable in such a circumstance only if the nondecisionmaker exerted such "singular influence" over the decisionmaker as to make the decision no more than a rubber stamp of the nondecisionmaker's recommendation. *Id.* The decisionmaker would not be considered a pawn of the nondecisionmaker, however, if he or she conducted an independent investigation into the relevant facts before rendering the adverse decision. *Id.* at 656-57.

Applying this test, the Seventh Circuit observed that the vice president of human relations considered Staub's past employment incidents, in addition to the supervisors' opinions, before rendering her ultimate decision. *Id.* at 659. Thus, the court held that a reasonable jury could not have concluded that the decision to terminate Staub was a product of "blind reliance." *Id.* Although the decision was influenced by the supervisors' opinions, it was not "'wholly dependent'" upon them, and thus Proctor was not liable. *Id.* (internal quotation omitted).

The Supreme Court reversed. It rejected the "singular influence" test and stated that the correct test of employer liability was one of proximate cause. 131 S. Ct. at 1194. The Court further found unpersuasive Proctor's argument that a decisionmaker's "independent investigation (and rejection) of the employee's allegations of discriminatory animus" relieves an employer of fault. *Id.* at 1193. It declined to adopt a "hard-and-fast rule" that a decisionmaker's independent investigation would be sufficient to negate the effect of a nondecisionmaker's discrimination. *Id.* The Court explained:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . .

obliges. The cat proceeds to pluck the chestnuts from the flames, singeing his paws in the process, while the monkey snatches the chestnuts away. *See id.*

then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. . . . The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.

*Id.*[7]

Here, the City argues that, under *Staub*, the District Court's decision denying its motion for judgment as a matter of law/notwithstanding the verdict must be reversed because the hearing before the PBI severed the causal connection between Colarulo's retaliatory animus and the Commissioner's ultimate decision to terminate Carnation.[8]

---

[7]By the terms of USERRA, it is the employer's burden to demonstrate that "the action would have been taken in the absence of [the employee's] membership [in the uniformed services]." 38 U.S.C. § 4311(c)(1). Similarly, under the familiar *McDonnell Douglas* burden-shifting framework applicable to Title VII cases such as this, if an employee establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (internal quotation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[8]We note that the City does not contest that the record was sufficient to support the jury's finding that Colarulo harbored retaliatory intent towards Carnation. Nor could it. There was more than enough evidence to support the jury's determination in this regard. The City only challenges the conclusion that Colarulo's animus may be imputed to the

Essentially, the City contends that Colarulo's animus was not a proximate cause of Carnation's termination because the PBI adjudicatory process was an intervening superseding cause. We do not agree.

"Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Id.* at 1192 (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, ----, 130 S. Ct. 983, 989 (2010)). It is "causation substantial enough and close enough to the harm to be recognized by law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004). "A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Staub*, 131 S. Ct. at 1192 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).

Once Carnation established a prima facie case that his termination was motivated by Colarulo's retaliatory animus, it was the City's burden to come forward with evidence that it terminated Carnation for reasons unrelated to Colarulo's original biased action in preferring charges against him. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). As the District Court noted, however, the testimony that was offered at trial did not illuminate the extent of the PBI's role in Carnation's termination. It is not clear that Carnation called witnesses on his behalf or cross-examined Colarulo, even if he could have.[9] The record does not reveal the testimony of the other witnesses for the City or if they were cross-examined. There was no testimony as to what the Commissioner saw or relied upon when making the

PBI, which recommended Carnation's termination, and the Commissioner, who actually terminated Carnation.

[9]At oral argument, Carnation's counsel suggested that Carnation did not and could not call any witnesses to testify on his behalf because of the general fear of retaliation from Colarulo.

decision to terminate Carnation. All that the evidence demonstrates is that Colarulo retaliated against Carnation by referring the 18s against him, the PBI affirmed those charges, and the Commissioner then terminated Carnation.

We agree with the District Court that "the events of [Memorial Day] weekend formed the grounds for the disciplinary charges against [Carnation] and the proceedings before the PBI, [and] a reasonable jury could find that Colarulo's animus played a substantial role in the ultimate decision by the PBI to recommend Carnation's termination." *McKenna*, 2010 WL 2891591, at *31. In the words of *Staub*, a reasonable jury could conclude that Colarulo's animus bore a direct and substantial relation to Carnation's termination and that the PBI's recommendation was not independent and was foreseeable. *See Staub*, 131 S. Ct. at 1192-93. *See also Sosa*, 542 U.S. at 703.

We are not convinced by the City's arguments to the contrary. The City argues that the fact that the PBI added a charge against Carnation demonstrates that the PBI was independent. The jury was entitled to conclude, however, that the added charge just as likely reflected that the PBI was not independent and that it adopted Colarulo's biased account of the events. Notably, the City argued to the jury that the PBI "added something that Colarulo hadn't even . . . introduced, and they made the decision to terminate him. [Carnation] was represented by his union that day, and he could have challenged that." App. at 3064. The jury found this unpersuasive, as do we.

The City also asserts on appeal that the PBI was necessarily independent because the hearing was "an adversarial fact-finding process accompanied by due process protections" that assessed the charges under "quasi-judicial scrutiny" and was "designed to elicit a complete airing of the facts before an unbiased board." Appellee's Reply Br. at 4. This characterization significantly exaggerates any inferences

15

that are permissible from the record.[10]  The City argued to the jury in its closing that the PBI "was a department process, and three independent people who didn't know Ray Carnation, who weren't involved with his other allegations, the information was presented to them, and they made the decision."  App. at 3064.  The jury was entitled to find this argument unconvincing.

We thus conclude that, under *Staub*, the District Court did not err in denying the City's motion for judgment as a matter of law/notwithstanding the verdict.  *Staub*, however, was not the law in effect at the time the jury was instructed or at the time that the District Court rendered its decision.

[10]At oral argument, Carnation's counsel informed this court that Carnation was not entitled to counsel or to review the evidence against him before the PBI hearing took place.  Nor was he permitted to respond to the 18s as they were passing through Colarulo's chain of command, other than check a box to plead not guilty to the charges and request a hearing.  Counsel also explained that Carnation's right to appeal from the PBI's ultimate recommendation was narrow.  And counsel noted that the Commissioner, when deciding Carnation's punishment, was given a limited record to review.  The Commissioner was not presented with the transcript of the PBI hearing, but rather was presented with "white papers," which included only the PBI's ultimate recommendation and Colarulo's statements.  None of this was made part of the trial record.  If it had been made part of the record, it would have only further demonstrated that the PBI was not, as the City characterizes it, an "independent adjudicatory process . . . involving a hearing with due process protections."  Appellee's Br. at 94.  We need not rely on counsel's statements at argument, however, as the record itself is insufficient to demonstrate the PBI's independence.  Even if the City had proven that the PBI was a truly independent body, this alone would not undermine the jury's determination, based on all the evidence, that there was a causal connection between Carnation's termination and his involvement in protected activity.

16

Rather, it was this court's decision in *Abramson* that was controlling. In *Abramson*, we did not explicitly characterize the applicable test as one of proximate cause. Rather, we explained that "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." 260 F.3d at 286. At oral argument, the City requested that we remand for a new trial so that the jury may be instructed in accordance with *Staub* if we conclude that Carnation prevails thereunder.

After consideration of the City's request, we find no reason to remand. The jury was instructed that it was Carnation's burden to demonstrate by a preponderance of the evidence that he was terminated after engaging in protected activity and that there was a causal connection between the termination and the protected activity. As to causation, the jury was instructed that "you must decide whether the plaintiff's protected activity . . . had a determinative effect on the alleged materially adverse action. Determinative effect means that if not for the plaintiff's protected activity, the alleged materially adverse action would not have occurred." App. at 3108.

The instructions to the jury incorporated the concept of proximate cause. Based on these instructions, the jury concluded that Colarulo's animus caused Carnation's termination, notwithstanding the intervening hearing before the PBI. The jury could not have reached a different decision as a matter of law, even if it had been instructed in accordance with *Staub*. As explained, there was no evidence to support a conclusion that the hearing before the PBI was an intervening superseding cause of Carnation's termination.

Thus, although the jury instructions did not precisely hew to the proximate cause language adopted in *Staub*, we conclude that the variation was harmless. We will decline to remand for a new trial with different instructions.

17

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.[11]

---

[11]The motion of the City of Philadelphia for leave to file a Supplemental Appendix is granted.