**PRECEDENTIAL**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Nos. 11-2419, 11-2485 and 11-2527

ROBERT ADDIE; JORGE PEREZ; JASON TAYLOR,

Appellants in 11-2419

v.

CHRISTIAN KJAER; HELLE BUNDGAARD; STEEN
BUNDGAARD; JOHN KNUD FÜRST; KIM FÜRST;
NINA FÜRST; KEVIN F. D'AMOUR

ROBERT ADDIE; JORGE PEREZ; JASON TAYLOR

v.

CHRISTIAN KJAER; HELLE BUNDGAARD; STEEN
BUNDGAARD; JOHN KNUD FÜRST; KIM FÜRST;
NINA FÜRST; KEVIN F. D'AMOUR

Kevin F. D'Amour,

Appellant in 11-2485

ROBERT ADDIE; JORGE PEREZ; JASON TAYLOR

v.

CHRISTIAN KJAER; HELLE BUNDGAARD; STEEN
BUNDGAARD; JOHN KNUD FÜRST; KIM FÜRST;
NINA FÜRST; KEVIN F. D'AMOUR

Christian Kjaer, Helle Bundgaard, Steen Bundgaard,
John Knud Fürst, Kim Fürst, and Nina Fürst,

Appellants in 11-2527

On Appeal from the District Court of the Virgin Islands
(Division of St. Thomas)
District Court No. 3-04-cv-00135
District Judge: Honorable Curtis V. Gomez

Argued on December 6, 2012

Before: SMITH, HARDIMAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: December 16, 2013)

Robert L. Byer, Esquire
Duane Morris, LLP
600 Grant Street, 50th Floor
Pittsburgh, PA   15219

2

Robert M. Palumbos, Esquire
John J. Soroko, Esquire **(Argued)**
Duane Morris, LLP
30 South 17th Street
Philadelphia, PA   19103

      Counsel for Appellants Robert Addie and Jorge Perez

Maria T. Hodge, Esquire **(Argued)**
Mark D. Hodge, Esquire
Gaylin Vogel, Esquire
Hodge & Francois
1340 Taarneberg
St. Thomas, USVI   00802

      Counsel for Appellee Kevin F. D'Amour

Carol G. Hurst, Esquire
Carol G. Hurst, P. C.
3562 Honduras, Suite 7
St. Thomas, VI   00802

Sherry L. Talton, Esquire **(Argued)**
302 North Market Street, Suite 450
Dallas, TX   75202

      Counsel for Appellees Christian Kjaer,
      Helle Bundgaard, Steen Bungaard, John
      Knud Fürst, Kim Fürst, Nina Fürst

OPINION

**ROTH,** Circuit Judge:

These appeals and cross-appeals involve a dispute over the sale of a small island in the U.S. Virgin Islands and an accompanying launching point on St. Thomas. Robert Addie, Jorge Perez, and Jason Taylor entered into two contracts of sale to purchase these two properties from Christian Kjaer and his relatives, Helle Bundgaard, Steen Bundgaard, John Knud Fürst, Kim Fürst, and Nina Fürst (collectively, the Sellers). As part of the contracts, Addie, Perez, and Taylor made a $1 million deposit and later paid an additional $500,000 to push back the closing date for the sale of the properties. The sale was never consummated, however, and Addie, Perez, and Taylor demanded the return of the deposits. Kjaer and his relatives refused, and this litigation ensued.

Addie, Perez, and Taylor appeal the District Court's orders dated August 14, 2009, March 1, 2011, and May 13, 2011. In the cross-appeal, Kjaer and his relatives appeal the District Court's orders dated March 1, 2011, and May 13, 2011. In the second cross-appeal, Kevin D'Amour, who was the sole owner and principal of the escrow agent for the transaction and who served as Kjaer's attorney, appeals the District Court's orders dated February 23, 2009, April 28, 2009, and September 24, 2010. For the reasons that follow, we will affirm in part and reverse in part.

4

## I.  Factual Background

The Sellers own two properties in the Virgin Islands: Estate Great St. James, which is an island off the coast of St. Thomas, and Estate Nazareth, which is a launch point providing access to Estate Great St. James from St. Thomas. In 2004, Robert Addie, a Florida real estate investor, and Jorge Perez, a financial advisor to high-net-worth individuals, sought to purchase these properties. Perez persuaded Jason Taylor, his client and a former Miami Dolphins player to join the deal.

### A.  Terms of the Contracts

In June 2004, Addie, Perez, and Taylor (collectively, the Buyers) entered into two land contracts (Contracts of Sale) and an Escrow Agreement to purchase Estate Great St. James and Estate Nazareth from the Sellers for $21 million and $2.5 million, respectively. Premier Title Company, Inc.,[1] served as the escrow agent and was party to the Escrow Agreement. Kevin D'Amour, the Sellers' attorney-in-fact, was the sole owner and principal of Premier. The Buyers assert that they were not aware of D'Amour's role at Premier when they entered into the Escrow Agreement.

The Contracts of Sale required the Buyers to submit an initial deposit of $1 million. Closing was to occur "at a mutually acceptable time of day within sixty (60) days of the execution of this Agreement." The contracts permitted the Buyers to extend the closing an additional thirty days by

---

[1]Premier was formerly known as First American Title Company, Inc.

5

paying a $500,000 nonrefundable deposit. The duty of the Buyers under the contract was to pay the purchase price at closing, less the deposit. The duty of the Sellers was to deliver "Clear and Marketable" title and "[a]ssignments of all permits, submerged land leases and other licenses necessary for the existence and occupancy of the dock and other improvements on the Real Property, together with the required governmental consents thereto." The Contracts of Sale defined Clear and Marketable title as "such title as is acceptable to and insurable by Buyer's title insurance company on ALTA Form B Owner's Policy (or other reasonable form) free and clear of exceptions except licenses and easements, if any, for public utilities serving only the Real Property."

The Escrow Agreement required Premier to receive the Buyers' deposits and then to release the deposits to the Sellers. Premier agreed to release the first deposit to the Sellers within twenty-four hours after the Sellers delivered the escrow documents to the Buyers, as long as Premier received written notice from the Buyers that they were satisfied with the documents. The escrow documents were to include (a) Insurable Warranty Deeds for both properties, (b) tax letters for both properties, (c) assignments of all permits, submerged land leases and other licenses necessary for the existence and occupancy of the dock and other improvements on the Island and the Nazareth Property, together with the required governmental consents thereto, including but not limited to assignments of Coastal Zone Permits; (d) a Foreign Investment in Real Property Tax Act (FIRPTA) Affidavit, (e) Sellers' affidavits that might be reasonably requested by Buyers' insurance company, and (f) an ALTA Form B

6

Owner's Title Insurance Policy in the Seller's name, showing that the properties are free and clear of all exceptions.

Under the Contracts of Sale, the Buyers agreed to forfeit the deposits to the Sellers as liquidated damages in the event of the Buyers' default or failure or refusal to perform, through no fault of the Seller. The Sellers agreed to return the deposits in the event of the Sellers' default or failure or refusal to perform, through no fault of the Buyer. The Contracts of Sale required the non-defaulting party to send written notice of default, and the defaulting party would have ten days from the receipt of written notice to cure the default.

## B. Closing on the Contracts

On June 4, 2004, Addie, Perez, and the Sellers' attorney, Kevin D'Amour, met in Miami to sign the Contracts of Sale and the Escrow Agreement. Unable to attend the meeting, Taylor signed the Contracts of Sale and Escrow Agreement on June 15, 2004, and faxed them to D'Amour.

Taylor alone funded the initial $1 million deposit by sending three wire transfers to the escrow account between June 9 and June 11. During July, D'Amour, acting on behalf of Premier, made several deliveries of escrow documents to the Buyers. Included in the documents were the Coastal Zone permits for the use of the docks at Estate Nazareth and Estate Great St. James. The permits for both docks had already expired. Also among the documents, the commitment for title insurance contained a number of exceptions to the required coverage, including an exception for "any portion or portions of the [properties] subject to or contiguous with property subject to the Virgin Islands Open Shoreline Act" and an

7

exception for a Right of Way Agreement for a road on Estate Nazareth.

D'Amour began to request that the Buyers authorize the release of the deposit to the Sellers. On August 3, Perez authorized release of the deposit in an email stating: "I have spoken to Hank Smock [local counsel to the Buyers], and he has advised me that we can go ahead and release the first deposit of $1,000,000.00." Based on this email, D'Amour, acting on behalf of Premier, released the deposit to the Sellers.

Taylor also unilaterally funded the second deposit of $500,000 to extend the closing date by sending three wire transfers to the escrow account between August 5 and August 19. On August 20, D'Amour emailed the Buyers asking them to "confirm by return email that the Escrow Agent [Premier] may release the [second deposit], subject to the terms of the Escrow Agreement." D'Amour did not receive written confirmation from the Buyers but nonetheless, acting on behalf of Premier, released the deposit to the Sellers.

In early September, the Sellers and the Buyers discussed extending the closing a second time. D'Amour informed the Buyers that the Sellers agreed to extend the closing date, stating:

> As a follow-up to my conversation with Jorge yesterday, my clients have consented to a one week extension of time to close. The original closing date was September 4, 2004. Since this fell on a Saturday, the next business day was September 7, 2004. (see Section 4). The closing date is now September 14, 2004. Time

is of the Essence. This extension shall not be deemed a waiver of any rights the sellers have under the Contract.

As of September 14, the Buyers had not paid the purchase price and the Sellers had not conveyed either updated assignments of permits or a Clear and Marketable title. On September 16, D'Amour sent the Buyers a notice of default, informing them that they had ten days to cure. On September 22 and 23, the Buyers demanded the immediate return of the escrow money, claiming that the Sellers were unable to deliver Clear and Marketable title. On September 24, D'Amour sent a request to the Buyers that they confirm their intentions to cure the default. The Buyers never responded.

## II.   Procedural Background

On October 15, 2004, the Buyers filed suit in the District Court of the Virgin Islands, asserting claims against the Sellers for breach of contract, unjust enrichment, negligent misrepresentation, fraud, and conversion. The Sellers filed counterclaims against the Buyers for breach of contract and fraud. The Buyers also filed suit against Premier and D'Amour for fraud and conversion.

Prior to trial, the District Court ruled on several motions for summary judgment. On the Sellers' motions, the District Court dismissed the Buyers' claims against the Sellers for negligent misrepresentation, fraud, and conversion. On the Buyers' motions, the District Court held D'Amour liable for conversion of the second deposit of $500,000. In addition, the Buyers and Premier settled prior to trial.

On June 22, 2009, the case proceeded to trial on the following issues: (1) the Buyers' breach of contract claim against the Sellers, (2) the Sellers' breach of contract claim against the Buyers, (3) the Buyers' unjust enrichment claim against the Sellers, (4) the Sellers' claim of fraud against the Buyers, (5) the Buyers' fraud claim against D'Amour, and (6) the Buyers' claim that D'Amour had converted Buyers' first deposit of $1 million.

A. Unjust Enrichment Claim

During the liability stage of trial, the jury found that the Sellers had been unjustly enriched. However, the District Court withheld the claim from the jury during the damages stage of trial and informed the parties that the Court would determine the amount of damages to award. After a full briefing by the parties, the District Court held the Buyers could not recover for unjust enrichment. The District Court explained, "[u]njust enrichment is an equitable remedy" whereby "it is well settled that unjust enrichment damages are unavailable when a claim rests on a breach of an express contract." *Addie v. Kjaer*, No. 2004-135, 2009 WL 2584833, at *5 (Aug. 14, 2009). The court reasoned that there was no dispute that the parties entered into valid, binding contracts. The Court concluded, "there is no doubt that the Buyers' breach of contract and unjust enrichment claims arise out of precisely the same core of operative facts: the unconsummated sale of land and the misdelivery of associated escrow funds." Accordingly, the District Court held that making an award for unjust enrichment was inappropriate.

B. Breach of Contract Claims

10

At trial, the jury found that Taylor did not breach the contract, but that Addie and Perez did. In addition, the jury found that all of the Sellers had breached, and awarded Taylor alone $1,546,000 in damages. On August 14, 2009, the District Court reduced this award to $1,500,000, representing the actual amount expended by Taylor. Sellers moved for reconsideration. On March 1, 2011, the District Court granted Sellers' motion, in part, amending the jury's award to Taylor from $1.5 million to $0. The Court reasoned that the Contracts of Sale imposed concurrent conditions and all of the parties had failed to satisfy these conditions within the closing timeframe. Because all of the parties had defaulted, the District Court held that no one could recover for breach of contract. Thus, Taylor could not recoup the $1.5 million deposit.

C. Tort Claims

1. The Sellers' Claims Against the Buyers

On Sellers' fraudulent misrepresentation claim against the Buyers, the jury found that Addie and Perez were liable for misrepresenting their financial ability to purchase the properties, but that Taylor was not. The jury awarded the Sellers $339,516.76 in damages. On August 14, 2009, the District Court entered judgment on the matter, affirming the jury's verdict and award of damages to Sellers. Addie and Perez moved for judgment as a matter of law. On May 13, 2011, the District Court granted Addie and Perez's motion, vacating the $339,516.76 jury award. The Court reasoned that judgment as a matter of law was appropriate because the gist of the action doctrine barred Sellers' fraudulent misrepresentation claim, as it "essentially parrots the Sellers'

11

breach of contract claim." *Addie v. Kjaer*, No. 2004-135, 2009 WL 1841131, at *5 (May 13, 2009). The court also reasoned that Sellers' claim for fraudulent inducement was waived because it had not been properly raised.

2. The Buyers' Fraud and Conversion Claims Against D'Amour

Prior to trial, the District Court granted summary judgment to the Buyers on their conversion claim against D'Amour, concerning the second deposit of $500,000, and denied D'Amour's motions for reconsideration and judgment as a matter of law. At trial, the Buyers alleged that D'Amour:

> fraudulently represented the Sellers' ability to deliver valid escrow documents…as promised in the Escrow Agreement, made false statements about the Buyers' obligation to release escrow funds, made false statements about Sellers' ability to deliver clear and marketable title, and failed to disclose his interest in the escrow agency.

*Addie v. Kjaer*, No. 2004-135, 2009 WL 3810883, at *5 (Sept. 10, 2009). The jury found that D'Amour was liable for false representation and failure to disclose and awarded the Buyers $46,000 in damages. In addition, the jury found that D'Amour was not liable for conversion of the first deposit of $1 million. In an order dated September 24, 2010, the

12

District Court upheld the $46,000 award and explained that it entered judgment for Taylor alone because Addie and Perez had filed a notice of renunciation of their interest in the award.

All of the parties appealed.

## III.  Discussion[2]

We must address two key issues in these appeals.  The first issue is which party is entitled to the $1.5 million deposit.  The Sellers assert that they are entitled to the deposit under a theory of breach of contract, while Taylor asserts that he is entitled to the deposit because holding otherwise would unjustly enrich the Sellers.  The second issue is whether the gist of the action doctrine bars the tort claims in this action.  For the reasons that follow, we conclude that (1) Taylor is entitled to recover the $1.5 million deposit in restitution, and (2) the tort claims are barred by the gist of the action doctrine.

Because this case arises out of diversity jurisdiction, Virgin Islands law governs.  *See Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 292-93 (3d Cir. 2002).  Under Virgin Islands law:

> The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 and 48 U.S.C. § 1612(a).  We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

13

not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

V.I. Code Ann. tit. 1 § 4. Furthermore, "[t]he Virgin Islands have adopted the Restatement (Second) of Contracts as the definitive source of decisional contract law, absent any local laws to the contrary." *Alejandro  v. L.S. Holding, Inc.*, 310 F. Supp. 2d 745, 748 n.2 (D.V.I. 2004).

## A. Breach of Contract

We first address the Sellers' breach of contract claim. The Sellers challenge the District Court's denial of their motion for judgment as a matter of law on their breach of contract claim against the Buyers.  "We review the denial of judgment as a matter of law *de novo,* viewing the evidence in the light most favorable to . . . the prevailing party." *McKenna v. City of Philadelphia*, 649 F.3d 171, 176 (3d Cir. 2011).

The Sellers assert that they are entitled to retain the $1.5 million deposit as liquidated damages under a breach of contract theory.  The District Court held, and the Buyers agree, that the contracts imposed concurrent conditions on the parties, and that due to both parties' failure to perform, the duties under the contracts were discharged.  The Sellers agree with the District Court that the contracts imposed concurrent conditions on the parties, whereby performance by one party

14

was conditioned upon the performance of the other party. The Sellers also agree that the District Court arrived at the correct result by refusing to return the deposit to the Buyers. However, the Sellers maintain that the District Court erred by upholding the jury verdict that they had breached the contract. In upholding the jury verdict, the District Court reasoned, "the Sellers did not prove that they extended an appropriate offer to perform." *Addie v. Kjaer*, No. 2004-135, 2011 WL 797402, at *9 (Mar. 1, 2011). The Sellers maintain, however, that they offered performance and the Buyers did not, which resulted in the Buyers' breach. In the alternative, the Sellers maintain that the Buyers repudiated the contracts, which obviated the Sellers' need to offer performance.

### 1. Concurrent Conditions

As the Restatement instructs, agreements concerning an exchange of promises require performance to be exchanged simultaneously whenever possible, unless the agreement indicates otherwise. Restatement (Second) of Contracts § 238 (1981). This simultaneous exchange of performances creates concurrent conditions, under which performance by one party creates a condition precedent for performance by the other party. *Id.* § 238 cmt. a.

Here, the Sellers were required to convey Clear and Marketable title and assignments of all permits, leases, and licenses necessary for the existence and occupancy of the docks in exchange for the Buyers' payment of the balance of the purchase price. Because the Contracts of Sale do not indicate otherwise, the performance of each obligation was to occur simultaneously. Therefore, as the District Court held, "[f]ulfillment of each obligation was a concurrent condition

15

to the other." *Addie v. Kjaer*, No. 2004-135, 2011 WL 797402, at \*6 (Mar. 1, 2011). We agree and hold that the contract contained concurrent conditions.

### 2. Offer of Performance

The Sellers dispute the District Court's holding that they failed to offer performance. The Sellers maintain that they offered performance by tendering escrow documents that demonstrated the Sellers' present ability to close because (1) the documents "complied with the essential terms of the contract" and (2) the "Buyers waived any defects in the documents." The Sellers also maintain that sending notices of default to Buyers beginning on September 16, 2004, constituted valid offers of performance.

In a contract with concurrent conditions, a party is not required to perform until the other party makes a valid offer to perform. Restatement (Second) of Contracts § 238 cmt. a. (1981). If no party performs, neither party is in default, nor liable for breach. *Id.* Thus, a claimant alleging breach of a contract that contains concurrent conditions must at least show that he or she offered to perform, and that the other party defaulted. *Id.* The Restatement further instructs that a valid offer to perform "must be made with the manifested present ability to make it good, but the offeror need not go so far as actually to hold out that which he is to deliver." *Id.* However, "[w]hen it is too late for either to make such an offer, both parties are discharged by the non-occurrence of a condition." *Id.*

The Sellers' delivery of escrow documents did not amount to a valid offer of performance. First, the escrow documents contained non-conforming documents, such as the

16

expired dock permits and the exceptions to the commitment for title insurance. Moreover, this transaction involved two sets of contracts, in which the Sellers agreed to two separate deliveries. Under the Escrow Agreement, the Sellers agreed to deliver the escrow documents, while under the Contracts of Sale the Sellers agreed to deliver Clear and Marketable title and assignments "at a mutually acceptable time of day." The Clear and Marketable title and the assignments were never delivered. The Escrow Agreement provided that "[a]t the Closing (as such term is defined in the Contracts of Sale) the Escrow Agent shall deliver the Escrow Documents to the Buyer." However, as the District Court correctly stated, this provision does not "diminish the Sellers' involvement in the conveyance of the property." The common law, as it is generally understood and applied in the United States, supports the conclusion that the Seller must do more than deliver a deed into escrow to convey title. *See, e.g., United States v. O'Dell*, 247 F.3d 644, 682 (6th Cir. 2001) (noting, "[t]hough O'Dell, Jr. signed the Warranty Deed over to Defendant, the deed was not delivered to Defendant because it was deposited with the escrow agent").[3] Therefore, despite

---

[3] *See also In re Chrisman*, 35 F. Supp. 282, 283 (C.D. Cal. 1940) ("In California, as elsewhere, delivery of an instrument in escrow conveys no title."); *Masquart v. Dick*, 310 P.2d 732, 749 (Or. 1957) (noting that a deed held in escrow "does not become a deed and operate to convey title until the second delivery, or perhaps, more accurately speaking, until the performance of a condition") (quotation marks omitted); *Yost v. Miller,* 74 Ind. Ct. App. 673, 129 N.E. 487, 488 (Ind. App. 1921) ("A deed in escrow conveys no title until final delivery."). *But see Matter of Newcomb*, 744 F.2d 621, 626 (8th Cir. 1984) ("[I]t is recognized that some interest in

17

Sellers' assertions that the documents "complied with the essential terms of the contract" and that the "Buyers waived any defects in the documents," Clear and Marketable title was not delivered.

Furthermore, the Sellers' notices of default to the Buyers beginning on September 16, 2004, did not amount to valid offers of performance. After September 15, neither party was required to perform. The District Court held that the last day to close was September 15. Therefore, the duties of the parties had already been discharged on September 16 because neither party performed.[4] We therefore hold that the Sellers did not provide a valid offer of performance.

### 3. Repudiation

In the alternative, the Sellers argue that their performance was excused due to the Buyers' repudiation. The Sellers allege that the Buyers' "continuous requests for extensions of the closing date" clearly communicated an inability to close. According to the Sellers, these continuous requests consisted of (1) the Buyers' first request to extend the closing, pursuant to Article 1.1 of the Escrow Agreement, and (2) the Buyers' second request to extend the closing, to which the Sellers approved a weeklong extension. In addition, the Sellers allege that the Buyers repudiated by demanding the return of the deposit and by ignoring D'Amour's request for assurance.

---

escrowed property is transferred to the ultimate grantee under the escrow at the creation of the escrow.").

[4] The Sellers argue that the last date to close was September 14. Regardless, the Sellers' notices also came after this date.

18

The Restatement defines repudiation as:

> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

Restatement (Second) of Contracts § 250 (1981). This statement "must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Id.* cmt. b. Moreover, a "[m]ere expression of doubts as to his willingness or ability to perform is not enough to constitute a repudiation." *Id.*

When repudiation occurs, it excuses the non-occurrence of the other party's conditional duty. *Id.* at § 225 cmt. b.. The Restatement instructs further:

> If one of the parties is already in breach, as where he has repudiated or has failed to go to the place appointed for the simultaneous exchange, the other party's duty to render performance may already have been discharged under 253(2) or

19

237, giving him a claim for damages for total breach under 253(1) or 243(1).

*Id.* at § 238.

Here, the Buyers' two requests to extend the closing date indicated neither that they intended to breach, nor that they were unable to perform. In fact, were the Sellers' allegations true, it would bring about a paradoxical result. The Contracts of Sale expressly permitted the Buyers to extend the closing date an additional thirty days at an additional cost. Therefore, if this request were deemed repudiation, it would also mean that the Contracts themselves contemplated and permitted repudiation. Furthermore, the Buyers' second request does not indicate that they intended to breach. A request for extension "cannot be reasonably interpreted to mean that the party will not and cannot perform." *Id.* § 250 (1981). In fact, the request indicates, to the contrary, that the Buyers were attempting to avoid default by postponing the due date of their performance.

Furthermore, the Sellers' allegation that the Buyers repudiated on September 22, 23, and afterward is also unsupportable. As discussed *supra*, the last day to close on the sale would have been September 15, 2004. Accordingly, the Contracts of Sale required the parties to satisfy their respective obligations by this date. Because we hold that the conditions were not satisfied by the last day to close under the contracts, the duties of the parties were discharged, leaving neither party liable for breach. In other words, Buyers were incapable of repudiating the contract after September 15.

20

We therefore hold that Sellers were not excused from providing a valid offer of performance in order to maintain an action for breach. Furthermore, the contracts imposed concurrent conditions on the parties, which both parties failed to perform, resulting in the discharge of both parties duties under the contracts. For these reasons, we therefore affirm the holding of the District Court that no one could recover for breach of contract.

## B. Restitution

We next address the District Court's decision with respect to restitution – or "unjust enrichment" as the District Court denominated it.[5] The District Court held that the Buyers were not entitled to restitution because the Buyers' claim rested on a breach of an express contract, "the unconsummated sale of land and the misdelivery of associated escrow funds." *Addie v. Kjaer*, No. 2004-135, 2009 WL 2584833, at \*5 (Aug. 14, 2009). On appeal, Taylor challenges the District Court's finding that the Buyers were precluded from obtaining restitution. Our review of the

---

[5] The District Court and the Buyers refer to this claim as one for "unjust enrichment." Because the Virgin Islands has adopted the Restatement (Second) of Contracts, we follow its use of the term "restitution." *See* Restatement (Second) of Contracts § 370. As the American Law Institute recently noted, when "refer[ring] to a theory of liability or a body of legal doctrine," the two terms are "generally . . . synonymous." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. c (2011). In addition, because the Buyers seek to recover the specific benefit provided to the Sellers, the term "restitution" is appropriate. *See id.*

21

application of legal precepts is plenary. *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986).

Here, the law in the Virgin Islands is silent with regard to awarding restitution in cases involving valid contracts. Therefore, we look to the Restatement (Second) of Contracts for applicable law:

> A party whose duty of performance does not arise or is discharged as a result of impracticability of performance, frustration of purpose, non-occurrence of a condition or disclaimer by a beneficiary is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

Restatement (Second) of Contracts § 377 (1981). For example, the Restatement illustrates: "A contracts to sell a tract of land to B for $100,000. After B has made a part payment of $20,000, A wrongfully refuses to transfer title. B can recover the $20,000 in restitution." *Id.* at § 373 illus. 1.

Here, the District Court erred by failing to apply this Restatement provision. In applying the Restatement (Second) of Contracts, it is clear that restitution is in order. Taylor provided a deposit of $1.5 million to the Sellers with the intent to purchase the two properties with Addie and Perez. However, all of the parties failed to perform within the timeframe specified in the contracts, and their respective

22

duties were discharged.  Thus, as the Restatement instructs, Taylor is entitled to restitution for the benefit of the deposit that he conferred to the Sellers.

We therefore hold that Taylor is entitled to restitution of the $1.5 million deposit from the Sellers.

## C.  The Tort Claims

We next address whether the gist of the action doctrine applies to the tort claims in this action.  The District Court held that the gist of the action doctrine barred Sellers' claims against the Buyers, but that it did not bar the Buyers' claims against D'Amour.  On appeal, the Sellers assert that the doctrine does not apply to their claims against the Buyers for fraudulent inducement and fraudulent misrepresentation. D'Amour, on the other hand, asserts that the doctrine does apply to the Buyers' claims for fraud and conversion against him.  For the reasons that follow, we conclude that the gist of the action doctrine applies to bar all of the tort claims in this litigation.

### 1.  Legal Framework

We first review the application of the gist of the action doctrine in the Virgin Islands.  The gist of the action doctrine is a theory under common law "designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  The doctrine is policy-based, arising out of the concern that tort recovery should not be permitted for contractual breaches.  *Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964).  Thus, while the existence of a

23

contractual relationship between two parties does not prevent one party from bringing a tort claim against another, the gist of the action doctrine precludes tort suits for the mere breach of contractual duties unless the plaintiff can point to separate or independent events giving rise to the tort. *See Air Prods. & Chem., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003). Generally, courts apply the gist of the action doctrine when the claims are

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contact claim or the success of which is wholly dependent on the terms of a contract.

*eToll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (internal citations omitted).

Neither this Court in its former supervisory capacity, nor the Virgin Islands Supreme Court has explicitly held that the gist of the action doctrine applies under Virgin Islands law. However, the Superior Court of the Virgin Islands has applied the doctrine in contract disputes arising in the Virgin Islands. *See Ringo v. Southland Gaming of the U.S.V.I., Inc.*, No. ST–10–CV–116 (MCD), 2010 WL 7746074, at *6 (V.I.

24

Super. Ct. Sept. 22, 2010).[6]  In addition, the District Court of the Virgin Islands has predicted "that Virgin Islands would adopt the Third Circuit's application of the gist of the action test" and has applied the doctrine.  *Charleswell v. Chase Manhattan Bank*, 308 F. Supp. 2d 545, 566-67 (D.V.I. 2004); s*ee also Davis v. Ragster*, CIV. 2005-155, 2008 WL 2074026, at *6 (D.V.I. May 14, 2008) (applying gist of the action doctrine to a claim for intentional infliction of emotional distress); *Galt Capital, LLP v. Seykota*, CIV. 2002-63, 2007 WL 2126287, at *3 (D.V.I. July 18, 2007), vacated in part, CIV. 2002-63, 2007 WL 6027812 (D.V.I. Aug. 10, 2007) (applying doctrine to intentional misrepresentation). We agree and hold that the doctrine is applicable in the Virgin Islands.

## 2.  Sellers' Fraud Claims Against Buyers

The Sellers challenge the District Court's May 13, 2011, order granting Addie and Perez judgment as a matter of law on the fraud counterclaim.  The Sellers argue that they

---

[6] *See also Jefferson v. Bay Isles Associates, L.L.L.P*, CV No. ST–09–CV–186, 2011 WL 3853332, at *10 (V.I. Super. Ct. Feb. 11, 2011) (acknowledging the application of the gist of the action doctrine in the Virgin Islands). *But see First Am. Dev. Group/Carib, LLC v. WestLB AG*, 55 V.I. 316, 331 (V.I. Super. Ct. 2011) ("There is no provision in the Code or the Restatement for the gist-of-the-action doctrine; furthermore, as Pennsylvania is apparently the only state to have adopted the doctrine, the Court cannot say that it is a rule of the common law 'as generally understood and applied in the United States.'").

raised two independent fraud claims at trial, fraudulent misrepresentation and fraudulent inducement. The District Court held that the gist of the action doctrine barred the Sellers' fraudulent misrepresentation claim and that the Sellers' fraudulent inducement claim was waived because it was not raised properly before the District Court. We review orders on a motion for judgment as a matter of law under Rule 50(b) de novo, where such a motion may be granted, "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (internal quotations omitted).

Here, the Sellers' fraudulent misrepresentation claim was clearly barred by the gist of the action doctrine because the misrepresentation became a part of the contract. The Sellers alleged that the Buyers "made material misrepresentations in Paragraph 12 of the Contracts of Sale, regarding Plaintiffs' financial ability to close with cash . . .." The Sellers' use of the Contracts of Sale for evidence of the misrepresentation indicates that the misrepresentation became a part of the contract. Therefore, we hold that this claim was barred by the gist of the action doctrine.

As for fraudulent inducement, the record supports the District Court's conclusion that Sellers' pleadings do not state such a cause of action. Rule 15(b)(2) allows for the amendment of a complaint to conform to the evidence offered at trial, as long as the parties consent either expressly or impliedly. *See* Fed. R. Civ. P. 15(b)(2). Here, Buyers never expressly consented to the amendment. The question then is whether Buyers gave their implied consent. To determine

26

whether a party has impliedly consented to the amendment of a pleading, courts look to:

> whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.

*Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995) (citations omitted). Furthermore, "an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried." *Id.*

At trial, any evidence that the Sellers introduced to support a fraudulent inducement claim would have been highly relevant to their fraudulent misrepresentation claim. Consequently, there would have been no way for Buyers to be on notice of Sellers' claim of fraudulent inducement. With neither express nor implied consent from the Buyers, the Sellers' have not amended their complaint to include a claim for fraudulent inducement. Therefore, we hold that the Sellers waived the fraudulent inducement claim by failing to properly amend their pleadings.

3. Buyers' Fraud and Conversion Claims Against D'Amour

Finally, we address D'Amour's challenge to the District Court's decisions with regard to the conversion claim for the second deposit of $500,000 and the fraud claims against D'Amour. With regard to the conversion claim, D'Amour asserts that the District Court erred by granting summary judgment to the Buyers and by denying his motions for reconsideration, an amended judgment, and judgment as a matter of law. With regard to the fraud claims, D'Amour asserts that the District Court erred by denying his motion for an amended judgment and judgment as a matter of law. Our "review of the substance of an order granting a summary judgment motion is plenary." *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1313 (3d Cir. 1994). We review motions to alter or amend a judgment filed pursuant to Rule 59(e) review for abuse of discretion, "except over matters of law, which are subject to plenary review." *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001). Finally, "[w]e review the denial of judgment as a matter of law *de novo,* viewing the evidence in the light most favorable to … the prevailing party." *McKenna v. City of Philadelphia*, 649 F.3d 171, 176 (3d Cir. 2011).

The Buyers maintain that the District Court properly held that the gist of the action doctrine is inapplicable because D'Amour was not a named party to the Contracts of Sale or the Escrow Agreement. In addition, the Buyers maintain that the District Court properly held that the duties allegedly breached by D'Amour were not grounded solely in the contracts themselves, but rather gave rise to independent tort claims. We discuss each issue in turn below.

First, we address whether the gist of the action doctrine applies to D'Amour despite the fact that he was not a party to the contracts. This "doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 548 (3d Cir. 2010); *see also eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (citations omitted). Application of this doctrine frequently requires courts to engage in a factually intensive inquiry as to the nature of a plaintiff's claims. *See Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 418 (E.D. Pa. 2006).

Other courts[7] analyzing the gist of the action doctrine provide guidance in applying the gist of the action doctrine to an individual who is not a party to the contract. These courts regularly find that the gist of the action doctrine bars tort claims against an individual officer-defendant where the duties allegedly breached were created by a contract between the plaintiff and the defendant's company. *See, e.g.*, *eToll*,

---

[7] The District Court declined to apply the gist of the action doctrine, reasoning that its application in previous Third Circuit cases was "rooted exclusively in Pennsylvania law" and "must still be squared with Virgin Islands law." *Addie v. Kjaer*, No. 2004-135, 2009 WL 1140006, at *6 (D.V.I. Apr. 28, 2009). However, as we hold today, the gist of the action doctrine applies under Virgin Islands law. Therefore, prior cases from this Court and the courts of Pennsylvania analyzing the doctrine are instructive in determining the application of the doctrine to individuals acting on behalf of a contracting party.

811 A.2d at 20-21.  In *eToll*, for example, the Superior Court of Pennsylvania applied the gist of the action doctrine and affirmed dismissal of a claim of fraud against several corporate officers because the "alleged acts of fraud arose in the course of the . . . contractual relationship" between the plaintiff and the corporate officers' company.  *eToll*, 811 A.3d at 12, 20.

The same principle resolves this case.  Although D'Amour was not a party to the contracts, the Buyers cannot detach D'Amour from his status as agent for Premier.  D'Amour was the sole principal and shareholder of Premier.  Therefore, Premier could not perform its duties under the Escrow Agreement but for D'Amour's actions.  In addition, the Buyers cannot detach D'Amour from his status as an agent for the Sellers.  D'Amour was acting on behalf of the Sellers when making the allegedly fraudulent statements.  In fact, these statements were memorialized in the contracts as the Sellers' promises of performance to the Buyers.

Furthermore, the alleged duties that D'Amour breached were all created and grounded in the contracts.  Relating to his role as Sellers' attorney, the fraud allegations included fraudulently representing the Sellers' ability to deliver valid escrow documents and Clear and Marketable Title, and making false statements about the Buyers' obligation to release escrow funds.  These allegations all relate to the contractual undertakings of the Sellers, and resulted in separate claims that the Sellers had breached the contracts.

Relating to his role as an officer of Premier, the allegations included D'Amour's failure to disclose his interest in the escrow agency and conversion.  These allegations

relate to the contractual undertakings of Premier. As we have already stated, all of Premier's actions were performed by D'Amour because he was the sole principal and shareholder of Premier. Therefore, D'Amour's actions in question here were inextricably intertwined with the contract claims.

We therefore hold that the gist of the action doctrine bars the tort claims Buyers asserted against D'Amour, all of which were based upon conduct that allegedly breached the contracts. We will reverse the District Court and order that the District Court enter judgment in D'Amour's favor finding him not liable.

## IV. Conclusion

For the foregoing reasons, we will reverse the District Court's August 14, 2009, order to the extent that it entered judgment against the Buyers on their unjust enrichment claim, reinstating the verdict of the jury. We will order the District Court to enter judgment in Taylor's favor and to order the return of the deposit to Taylor. We will affirm the District Court's March 1, 2011, order (1) denying Sellers' motions for judgment as a matter of law on the breach of contract and fraud claims and (2) granting in part Sellers' motion for amended judgment, by reducing Taylor's recovery against Sellers to $0. We will affirm the District Court's May 13, 2011, order granting judgment as a matter of law in favor of Addie and Perez on the Sellers' fraud counterclaim. We will reverse the District Court's April 28, 2009, order on D'Amour's motion for reconsideration of the District Court's February 23, 2009, order granting partial summary judgment on Buyers' conversion claim for the second deposit of $500,000. We will reverse the District Court's September 24,

31

2010, order denying judgment as a matter of law, amended judgment, or alternatively, a new trial to D'Amour on the fraud and conversion claims against him, and order that the District Court enter judgment in D'Amour's favor finding him not liable.