PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4584
_____

FRANK C. POLLARA GROUP, LLC;
FRANK C. POLLARA, Individually

v.

OCEAN VIEW INVESTMENT HOLDING, LLC,
f/k/a Southgate Crossing Investments, LLC;
OMEI GROUP, LLC; LUCY CHENG; MAIT DUBOIS,
                                        Appellants
_____

On Appeal from the District Court of the
Virgin Islands
(D.C. No. 1-09-cv-00060)
District Judge:  Honorable Donetta W. Ambrose
_____

Argued on December 9, 2014

Before:  CHAGARES, JORDAN and SHWARTZ, *Circuit
Judges*.

(Filed: April 23, 2015)
_____

Andrew C. Simpson, Esq.    [ARGUED]
Emily A. Shoup, Esq.
Andrew C. Simpson Law Offices
2191 Church Street, Suite 5
Christiansted, VI 00820
      *Counsel for Appellants*

K. Glenda Cameron, Esq.
Law Offices of K. G. Cameron
2006 Eastern Suburb, Suite 6
Christiansted, VI 00820

Lee J. Rohn, Esq.
Mary F. Carpenter, Esq.
Rhea R. Lawrence, Esq.    [ARGUED]
Lee J. Rohn & Associates
1101 King Street
Christiansted, VI   00820
      *Counsel for Appellees*

———————————

OPINION

———————————

JORDAN, *Circuit Judge*.

This case arose from a real estate investment and development scheme based on the island of St. Croix in the United States Virgin Islands.  The OMEI Group ("OMEI"), Ocean View Investment Holdings, LLC ("Ocean View"), Lucy Cheng, and Mait Dubois (collectively, the "Appellants") ask us to reverse a ruling of the District Court of the Virgin Islands denying their motion for summary judgment on

claims of misrepresentation brought by Frank Pollara and his construction company, the Frank C. Pollara Group. Because the summary judgment motion did not present a pure question of law and because the Appellants failed to properly preserve the factual issues they now endeavor to raise, we conclude that we cannot review the District Court's ruling on that motion. We can, however, and will affirm the District Court's refusal to set aside the jury verdict awarding Pollara and his company compensatory and punitive damages.

## I.  Background[1]

### A.  The Project that Wasn't

OMEI is a Delaware limited liability company that supposedly served as an investment vehicle for people that Lucy Cheng claimed to represent. Cheng presented herself as an investment specialist and an expert in international tax matters. Mait Dubois was her deputy in the management of OMEI. Cheng and Dubois were also the front people for the investors in Ocean View,[2] an entity established exclusively to

---

[1] These facts are recounted in the light most favorable to Pollara, the non-movant, with respect to both the summary judgment motion and the motions to set aside the verdict. *See infra* n.9.

[2] Cheng said that she represented both OMEI's investors and a controlling group of Ocean View investors. According to Pollara – and the entities' operating agreements – OMEI's investors were a smaller subset of the Ocean View Investors. Ocean View was formerly known as Southgate Crossing Investments, LLC.

lend money to yet another entity, Southgate Crossing, LLC, which is said to be the "owner" of a real estate development known as "Southgate Crossing."[3] Ocean View used inter-company loans to funnel money to Southgate Development Group, LLC ("SDG"), which, in turn, was supposed to develop Southgate Crossing. The layers of business entities involved in this matter were avowedly meant to insulate the investors and the underlying real estate asset from liability and to minimize any tax burden.[4]

A South Carolina realtor named Rick Willis – who is not a party to this action – devised the initial plan for Southgate Crossing, which was to purchase 68 acres at Estate Southgate on St. Croix, re-zone it to increase the number of housing units that could be built on the property, and to then subdivide the land, build subdivision infrastructure, and sell the individual lots.[5] Willis met Cheng at a seminar in 2006

---

[3] Qualifiers like "said to be" and the need to set the word "owner" off with quotation marks are a consequence of the deliberately obscure record that Cheng and her fellow Appellants managed to create in the course of their highly dubious business activities.

[4] As the Appellants state in their briefing before us, the intent was to make the property "judgment[] proof." (Appellants' Br. at 4.)

[5] SDG and Southgate Crossing LLC both had the same ownership: 50% by Rick Willis, whose role is further described herein, and his wife, and 50% by the OMEI

4

and she agreed to become a participant in the project. When Cheng met secretly with her investors, however, she said that it was not her intention to develop the land at all, but rather to sell it as soon as possible.

In 2007, Willis was working with an architect, Christopher McCarthy, who proposed putting over 200 houses on the Southgate Crossing property. Cheng conferred with McCarthy sometime around October of 2007 and told him that she was in charge of overseeing the project and safeguarding the investors' interests. She also told McCarthy that her "specialty" was manipulating companies to make it "look[] like A and run it through so many different permutations that it would come out over here as Z." (App. at 541-42.) After McCarthy created preliminary schematics for the proposed development, Cheng made him sign a contract that assigned to SDG the copyright to the drawings, before she would pay him. Prior to signing the contract, McCarthy had never heard of SDG. McCarthy explained to Cheng that the schematics were not sufficient to obtain building permits. They were, he said, just "pretty pictures." (App. at 547.)

By August 2008, Cheng was making all of the decisions for the project, but Willis was still involved. Around that time, Frank Pollara, a 47-year veteran of the construction industry, met with Willis about bidding to build an entrance for Southgate Crossing. Pollara reviewed the McCarthy schematics and informed Willis that they were incomplete and that it would be difficult to make a bid based on them. Pollara nevertheless submitted a bid in August 2008

investor group through a holding company called SDG Venture Holdings.

5

and Cheng called him to talk about it. She told Pollara it was "her money" at stake and that she handled money for foreign investors. (App. at 584-85.) She further told Pollara he would also be dealing with Mait Dubois, her associate. Cheng later asked Pollara to undertake the entrance construction job.

Accordingly, Pollara submitted a scope-of-work letter. Willis told him that "Lucy [Cheng] is the person who will approve any written agreement … ." (App. at 311.) Cheng, Dubois, and Willis all told Pollara that the necessary building permits for the entrance had been obtained and that the project was "ready to go." (App. at 509, 590-91, 594-95.) Pollara heard the same thing from Kima Merrick, who was an office worker on the project for a time but was, for reasons unclear in the record, terminated. On September 6, 2008, Pollara signed a contract with "Southgate Crossing" to construct the entrance for $193,000. (App. at 1198.) At some later point, Willis – acting under Cheng's instructions and unbeknownst to Pollara – changed the contract to designate "Southgate Development Group, LLC" as the contracting entity. (App. at 594, 1198.) In actuality, the investors did not approve the creation of SDG until November 2008. When he signed the contract, Pollara was unaware that the project had not been permitted.[6]

Pollara began work on the entrance in September 2008. On September 18, the Virgin Islands Department of

_____

[6] If he did not at least suspect a problem with permits, however, it would be puzzling, given his many years of construction experience and his own earlier comments to Willis about the incomplete nature of the schematics.

Planning and Natural Resources (the "Department of Planning") served Pollara with a "stop notice" and a cease-and-desist order for failing to obtain required permits for the work. (App. at 591-92, 598.) When Pollara called Cheng about the stop order, she initially told him that "we have a permit" (App. at 599), but eventually she asked him to obtain the necessary government approvals. When he informed her that doing so was outside the scope of their contract, she offered to pay for the additional work. Pollara retained McCarthy to provide appropriate plans for the entrance so that he could submit them to the Department of Planning. The permitting process also required Pollara to add electrical, plumbing, and irrigation features that were not covered by the initial construction contract. Moreover, Pollara had to perform additional landscaping, in keeping with the newly prepared plans. He eventually succeeded in getting an earth-change permit, a flood hazard permit, an electrical permit, and a building permit.

In October, construction hit a setback when the roadway in front of Southgate Crossing was "washed out completely" by heavy rains. (App. at 515.) Cheng and Dubois instructed Pollara to repair the roadway, stating that they would pay for it, even though Pollara could not provide a cost estimate for the repairs. After Pollara sent the first invoice for his work, Cheng told him to bill SDG, rather than Southgate Crossing, LLC, because SDG was, as she put it, "the company with the money." (App. at 595.) Cheng explained that SDG was funded by OMEI and that "she controlled the money." (*Id.*) When Pollara questioned the payment process, he was told by Cheng's accountant that Cheng approved all payment requests because it was her money. Thus, when Pollara prepared the invoice for the

7

roadwork, it read "[c]ost of road repair as per agreement with investors" and listed charges of $37,483. (App. at 1452.)

At some point, Dubois and Cheng asked Pollara to obtain the permits that would allow the development of approximately 200 townhomes on the Southgate Crossing property. Pollara believed he could do so because he had a good relationship with the Department of Planning, and he agreed to do so because Cheng and Dubois offered him a dramatically new deal: they would make Pollara a 25% owner of the development project. The plan was – or so Pollara thought – to build about 200 townhouses in a gated community and to market and sell them. Dubois showed Pollara a spreadsheet forecasting a $20 million profit on a $100 million project, with Pollara having a 25% equity stake.

Later, Willis told Pollara that the investors might want to sell a few parcels of the property. Pollara became concerned that such sales would create the appearance that the developers simply wanted to "flip" the property, *i.e.*, sell it off without actually adding development, which would upset the Department of Planning and the Governor because they "truly believe[d]" in the project. (App. at 612, 1364.) Cheng and Pollara also exchanged emails about the lack of cash in SDG's bank account and the fact that SDG required a capital infusion from Cheng's investors. To conceal her true motives, Cheng told Pollara that she was keeping SDG's account empty because she feared that Merrick, the one-time office worker on the project, might sue for wrongful termination. Cheng promised that she would move funds around from other accounts in order to pay for the construction work. Pollara thus hired and paid for

8

engineering and survey work on the project and also paid for McCarthy's planning and design services.

While Cheng and Dubois reassured Pollara that they were committed to developing Southgate Crossing, they were, in reality, planning to wait for a time and then flip the property rather than develop it. Pollara stated that, had he known their true intentions, he would not have gotten involved with them. He thought that he was participating in a real project that would create jobs and develop the land.

To keep Pollara involved, Cheng and Dubois continued to tell him that the development of Southgate Crossing was proceeding as planned. And, Pollara continued actively working on the project, often 12 hours a day or longer, and expending money. Around December 8, 2008, Dubois sent to Cheng an email relaying that Pollara was doing extra work – such as completing a cost detail spreadsheet and providing model construction costs – free of charge because he believed he was receiving a 25% equity stake in a real development. Dubois acknowledged in the email that he knew that Cheng and the other investors simply wanted to sell the property and that they lacked the financing to proceed with the project. He also suggested telling Pollara that they were underfunded, but he did not do that. Instead, on December 21, 2008, he sent Pollara another email telling him how much they appreciated his efforts and that, because the investors initially agreed only to finance the purchase and permitting of the land, the creation of a separate development company with additional financing was necessary. He admitted that the billing procedures needed streamlining and that they were unprepared for the scope of Southgate Crossing, but he promised that, if Pollara would continue to

work with them, they would all "make a lot of money." (App. at 1410-11.)  Pollara continued working on the project.

On February 5, 2009, Cheng sent an email to Dubois saying that she wanted to "just complete the entrance and [landscaping] and put up the project for sale" because she "[could] not deal with [Pollara's] style or any other builders in St. Croix."  (App. at 1414.)  Dubois responded that, even though they were planning to sell, they "need[ed] to keep [Pollara] moving forward (ESPECIALLY UNTIL WE GET THE PERMIT)."  (App. at 1413 (emphasis in original).)  The next week, Cheng proposed cutting off payments to Pollara because SDG and Ocean View were short on money, but Dubois argued that, since the investor group approved the expenditures and since Willis, Cheng, and Dubois approved the work and costs, it was not "fair" to "simply ... cut[]off the funding."  (App. at 1416.)  Dubois went on to ask "[w]hy not let [Pollara] continue to think he is going to do the project and continue to be supportive of us instead of getting him mad[?]"  (*Id.*)  Later, Dubois emailed Cheng and Willis that "I would like to [communicate to Pollara that] we still wanted to be in the deal."  (App. at 1419.)  At trial, the following exchange revealed Dubois's mindset:

> [Counsel for Pollara:] [W]hy would you intentionally misrepresent to [Pollara] that you were still in the deal when you knew you weren't?
>
> [Dubois:] All I was trying to do was get the gate completed.

(App. at 874.)

10

In March, Cheng and Dubois stopped paying Pollara's invoices for raw costs and locked him out of his office at the development site. Additionally, Pollara was never paid for the repair work to the roadway after the flooding in October 2008. Although there was some evidence that Willis was interested in saving the project, Cheng and Dubois had decided to have Ocean View foreclose on the property, thus eliminating Willis's interest and destroying any interest that Pollara could claim. Cheng and Dubois, standing on both sides of the financing, refused any extension of the financing terms and withheld their consent to selling the development at a profit to a buyer whom Willis had found. Instead, they caused Ocean View to foreclose on the land, acquiring the property free of Willis's and Pollara's interests. On April 14, 2009, Pollara wrote a demand letter to Cheng and Dubois for approximately $201,000 (representing $159,894.57 in unpaid invoices and about $41,000 for repair work to the roadway). Pollara placed a construction lien on the property, listing Cheng and Dubois as his contracting counterparties.

**B.     Procedural History**

On June 3, 2009, Pollara and his construction company[7] filed suit against SDG, Southgate Crossing, LLC, and Ocean View in the Superior Court of the Virgin Islands, alleging that they owed him $201,000 under a theory of quantum meruit. Pollara later stipulated to the dismissal of Southgate Crossing, LLC and SDG. Ocean View then timely

---

[7] For ease of reference, "Pollara" will from this point be used to refer collectively to Mr. Pollara and his business entity, Frank C. Pollara Group, LLC.

removed the case to the District Court of the Virgin Islands. Pollara amended his complaint in 2010 to add OMEI, Cheng, and Dubois as defendants and to add a claim for unjust enrichment. In 2011, Pollara amended the complaint a second time to add a claim for intentional or negligent misrepresentation. At the conclusion of discovery, the Appellants moved for summary judgment, arguing that they had no contract with Pollara and, in fact, had nothing to do with the project, other than insofar as Cheng and Dubois were acting on behalf of the contracting entities Southgate Crossing, LLC and SDG. They further argued that the existence of a written contract with Pollara – though they disclaimed being any part of it – barred the quantum meruit and unjust enrichment claims. The Appellants also raised the "gist-of-the-action doctrine" as a defense to Pollara's misrepresentation claims, saying that there could be no tort claims because "any misrepresentations regarding payments to plaintiffs arise out of the *contractual* duty to pay them." (App. at 1599 (emphasis in original).) The District Court denied the summary judgment motion, holding that the Appellants could not invoke a contract defense, such as the gist-of-the-action doctrine, when they expressly disclaimed the contract itself. *Frank [C.] Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, No. 9-60, 2013 WL 171087, at *2-4 (D.V.I. Jan. 10, 2013).

By the time the case proceeded to trial, the parties had agreed to a verdict form which listed five subjects about which the Appellants had purportedly made misrepresentations: (1) the original building permit for the entrance, (2) the additional work for the entrance, (3) the roadway repair work, (4) various permits for construction of group dwellings, and (5) the proposals for the development

12

plan. Jurors were asked to identify for each of the Appellants, using a chart, whether that specific party had made an intentional misrepresentation, a negligent misrepresentation, or no misrepresentation at all concerning each of those subjects. The jury found that Ocean View and Cheng had made intentional misrepresentations and that OMEI had made negligent misrepresentations as to every subject. It found that Dubois had made negligent misrepresentations with respect to the original building permit and the proposals for the development plan, and intentional misrepresentations as to the other three subjects. The jury awarded Pollara compensatory damages of $391,626 from all of the Appellants and punitive damages totaling $90,000 against Cheng, Ocean View, and Dubois. The Appellants timely filed a motion for a new trial under Federal Rule of Civil Procedure 59, claiming insufficient evidence to support the verdict and damages, and a motion for judgment as a matter of law challenging the sufficiency of the evidence under Rule 50(b).[8] The Rule 50(b) motion was the renewal of a timely Rule 50(a) motion for judgment as a matter of law that the Appellants had made at the close of Pollara's case-in-chief. They did not renew their gist-of-the-action defense in those motions, which the District Court had earlier addressed in the order denying summary judgment. The District Court denied the post trial motions and this appeal followed. *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding LLC*, No. 9-60, 2013 WL 5992629 (D.V.I. Nov. 12, 2013).

---

[8] All references herein to a "Rule" are to the Federal Rules of Civil Procedure.

13

## II.  Discussion[9]

The Appellants challenge the District Court's denial of their motion for summary judgment and what they perceive to be an inconsistency in the verdict. We discuss their arguments on each of those subjects.[10]

---

[9] The District Court had jurisdiction under 28 U.S.C. §§ 1332 and 1441. To the extent that we have jurisdiction, it is pursuant to 28 U.S.C. § 1291. In deciding an appeal involving a motion for judgment as a matter of law, we view the evidence in the light most favorable to the non-moving party and give that party the advantage of every fair and reasonable inference. *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009). "[W]e must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury." *Id.* (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal quotation marks omitted)). Likewise, in reviewing an appeal from the denial of a motion for a new trial, "we must view the evidence in the light most favorable to the non-moving party." *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 128 (3d Cir. 2003) (quoting *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 1999) (internal quotation marks omitted)).

[10] We do not, however, give a detailed discussion of other arguments they raise. Although Appellants' gist-of-the-action claims were not the subject of Rule 50 motions, they did make both Rule 50 and Rule 59 challenges to the sufficiency of the evidence on other issues. Viewing the evidence in the light most favorable to Pollara as we must, *see supra* n.9, it is beyond serious dispute that the record

14

### A. Summary Judgment

The Appellants argue that their summary judgment motion based on the gist-of-the-action defense should have been granted by the District Court.[11] As a threshold matter, we must decide whether the order denying summary judgment is reviewable, since the Appellants did not renew their argument in Rule 50 motions for judgment as a matter of law. Given governing precedent from the Supreme Court, it has become apparent that when, as in this instance, a summary judgment motion does not present a pure issue of law and the issues it does present have not been raised and renewed by proper motions for judgment as a matter of law under Rule 50, those issues are not reviewable on appeal.

---

adequately supports the jury's verdict on each issue they raise. Accordingly, we do not need to discuss Appellants' myriad challenges to the sufficiency of the evidence supporting the jury's verdict.

[11] Pollara urges us to hold that the gist-of-the-action doctrine does not apply under the law of the Virgin Islands. Pollara offers no argument or briefing in furtherance of that contention and it is contrary to our existing precedent. *See Addie v. Kjaer*, 737 F.3d 854, 868 n.7 (3d Cir. 2013) (Roth, J.) ("[W]e hold today, the gist of the action doctrine applies under Virgin Islands law."). More importantly, the Supreme Court of the Virgin Islands has recently held that the gist-of-the-action (or barred-by-contract) doctrine does apply in the Virgin Islands. *Cacciamani and Rover Corp. v. Banco Popular de Puerto Rico*, S.CT.CIV. No. 2013-0063, 2014 WL 4262098, at *3 (V.I. Aug. 29, 2014).

In *Ortiz v. Jordan*, the Supreme Court observed that, generally, a party may not appeal an order denying summary judgment after a full trial on the merits.  562 U.S. 180 (2011).  "[O]rders denying summary judgment do not qualify as 'final decisions' subject to appeal."  *Id.* at 188.  Rather, such an order "retains its interlocutory character as simply a step along the route to final judgment."  *Id.* at 184.  "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion."  *Id.*  There is an exception to this general rule, however, for an order denying summary judgment on "a purely legal issue" capable of resolution "with reference only to undisputed facts."  *Id.* at 190 (internal quotation marks omitted).  *See also, e.g.*, *Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 n.2 (2d Cir. 2014) (noting that *Ortiz* leaves open a narrow exception for purely legal questions); *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012) (same); *Copar Pumice Co., Inc. v. Morris*, 639 F.3d 1025, 1031 (10th Cir. 2011) (same); *Owatonna Clinic–Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind.*, 639 F.3d 806, 809-10 (8th Cir. 2011) (same).  To qualify as an appealable order, a district court's summary judgment ruling cannot turn on "what occurred, or why an action was taken or omitted, but [must relate to] disputes about the substance and clarity of pre-existing law."  *Winfield v. Trottier*, 710 F.3d 49, 53 (2d Cir. 2013) (alteration in original) (internal quotation marks omitted).  Accordingly, because Appellants did not include their gist-of-the-action argument in their motions for judgment as a matter of law under Rule 50, we may only review that argument now if it presents a purely legal question.

The gist-of-the-action doctrine is a theory under common law "designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10, 14 (Pa. Super. Ct. 2002).[12]  It is policy-based, arising out of the concern that tort recovery should not be permitted for breaches of contract. *Glazer v. Chandler,* 200 A.2d 416, 418 (Pa. 1964).  "[W]hile the existence of a contractual relationship between two parties does not prevent one party from bringing a tort claim against another, the gist of the action doctrine precludes tort suits for the mere breach of contractual duties"; the plaintiff must instead point to independent events giving rise to the tort. *Addie v. Kjaer*, 737 F.3d 854, 865-66 (3d Cir. 2013).  Thus, "[a]pplication of this doctrine frequently requires courts to engage in a factually intensive inquiry as to the nature of a plaintiff's claims." *Id.* at 868.

In *Pediatrix Screening, Inc. v. TeleChem International, Inc.*, a case that preceded the Supreme Court's decision in *Ortiz*, the plaintiff, Pediatrix, had filed a motion to dismiss defendant TeleChem's counterclaims.  602 F.3d 541, 544 (3d

---

[12] Pennsylvania law is instructive in interpreting the gist-of-the-action doctrine in the Virgin Islands.  *See, e.g.*, *Jefferson v. Bay Isles Assocs.*, *L.L.L.P.*, No. ST-09-CV-186, 2011 WL 3853332, at *10 (V.I. Super. Feb. 1, 2011) (relying on Pennsylvania law in applying gist-of-the-action doctrine); *see also Addie*, 737 F.3d at 868 n.7 (stating in a case governed by Virgin Islands law that "[P]rior cases from this Court and the courts of Pennsylvania analyzing the [gist-of-the-action] doctrine are instructive in determining the application of the doctrine to individuals acting on behalf of a contracting party.").

Cir. 2010). In that motion, Pediatrix asserted the gist-of-the-action defense, but the motion was denied and the case went to trial. *Id*. After trial, Pediatrix moved for a new trial under Rule 59, arguing that the district court had wrongly decided the motion to dismiss and that the gist-of-the-action defense should have applied. *Id.* at 544-45. The district court denied that motion too. Then, on appeal, TeleChem argued that Pediatrix had waived its challenge to the district court's ruling on the gist-of-the-action defense because Pediatrix had failed to raise it in motions for judgment as a matter of law under Rule 50. *Id.* at 545. A divided panel of this Court held that the applicability of the gist-of-the-action defense was a legal issue and thus was sufficiently preserved for appellate review because the argument had been raised in the earlier motion to dismiss. *Id.* at 546-47 ("The issue here is whether the misrepresentation claim, even if supported by sufficient evidence, is nevertheless precluded by the gist of the action doctrine. That legal dispute is clearly set forth in Pediatrix's Rule 12(b)(6) motion... ."); *but see id.* at 551 (Jordan, J., dissenting) ("[A] Rule 50 motion may very well be required [to preserve an issue for appeal] when a legal question depends on the resolution of factual issues, such that the legal question cannot be resolved without reference to the evidence amassed at trial.").

The next year, the Supreme Court decided *Ortiz*, which emphasized that, when a legal issue initially raised at summary judgment – in that case, qualified immunity – depends on the resolution of factual questions, motions for judgment as a matter of law under Rules 50(a) and (b) are indeed required to preserve the legal issue for appellate review. 562 U.S. at 182-84. *Ortiz* involved a former prison inmate who brought civil rights claims under 42 U.S.C.

18

§ 1983 against various prison officials. *Id.* at 182-83. The prison officials moved for summary judgment, asserting qualified immunity as a defense, and the district court denied the motion. *Id.* The officials filed a motion for judgment as a matter of law at the close of evidence, but did not renew their motion after the jury returned a verdict for the plaintiff. *Id.* at 187. The United States Court of Appeals for the Sixth Circuit determined that, when a summary judgment motion is grounded on a claim of qualified immunity, the denial of that motion is reviewable. *See Ortiz v. Jordan*, 316 F. App'x 449, 453 (6th Cir. 2009) (holding that a "denial of summary judgment based on qualified immunity is an exception to th[e] rule" that "courts normally do not review the denial of a summary judgment motion after a trial on the merits"). The Supreme Court reversed. *Ortiz*, 562 U.S. at 183-84. Notwithstanding that qualified immunity is frequently described as a question of law,[13] the Supreme Court ruled that the "[defendants'] failure to renew their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) left the appellate forum with no warrant" to review the denial of summary judgment because the "officials' claims of

---

[13] *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) ("The issue of qualified immunity is generally a question of law... ."); *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007) ("[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury."); *cf. Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.").

19

qualified immunity hardly present purely legal issues capable of resolution with reference only to undisputed facts." *Id.* at 185, 190 (internal quotation marks omitted). The Court reasoned that, when a litigant's summary judgment motion is denied and the case proceeds to a full trial on the merits, the summary judgment record becomes displaced by the trial record and the summary judgment ruling is no longer reviewable. *Id.* at 184. The message was that a litigant must ordinarily renew any objection to the denial of summary judgment through Rule 50 challenges both at and after trial. *Id.* at 190-92.

In light of *Ortiz*, it is clear that, if an earlier dispositive argument is not renewed through motions for judgment as a matter of law under Rule 50(a) and Rule 50(b), the litigant propounding the argument may not seek appellate review of a decision rejecting it, unless that argument presents a pure question of law that can be decided with reference only to undisputed facts. To the extent our decision in *Pediatrix* suggests otherwise, it has been overruled by *Ortiz*. While we are mindful that "[i]t would be unfair to ... penalize [a litigant] for failing to jump up and down or labor an objection" that is already a part of the record, *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 109 (3d Cir. 2001), it is not unfair to make litigants deal with the full record. Again, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Ortiz*, 562 U.S. at 184. Insofar as an issue has a factual component, the failure to raise the issue in motions for judgment as a matter of law at and after trial makes it inappropriate for an appellate court to address what should have been directed to "the judge who saw and heard the witnesses and had the feel of the case

20

which no appellate printed transcript can impart." *Id.* at 185 (internal citations and quotation marks omitted).

The failure to preserve arguments in properly filed Rule 50 motions is particularly vexing when, as is often the case, a litigant is really challenging the sufficiency of the evidence. *Cf. Ortiz*, 562 U.S. at 190 (despite prison officials' insistence "that sufficiency of the evidence is not what is at stake in this case[,]" their claims of qualified immunity implicated factual issues); *Pediatrix*, 602 F.3d at 552 (Jordan, J., dissenting) ("[I]t seems that Pediatrix is really saying that it is entitled to judgment in its favor … because there was insufficient evidence at trial to establish any fraud independent of the parties' contractual relationship. That is an argument that could have, and should have, been raised at trial. Because it was not, it has been waived."). *Ortiz* clarified that only "neat abstract issues of law" fit the exception to the rule requiring that arguments be preserved in Rule 50 motions. *Ortiz*, 562 U.S. at 191 (internal quotation marks omitted). Cases in which the facts that could render an actor answerable for his conduct are disputed or in which questions exist as to what occurred simply do not fit. *Id.*

With that framework in mind, we turn to whether the applicability of the gist-of-the-action defense in this case presents a purely legal question or whether it necessarily involves reference to disputed facts. The District Court held that the defense did not apply because the parties were not in privity. That ruling, however, was couched in the language of estoppel – that is, the Court's essential holding was that, because the Appellants denied being bound by the contract, they could not simultaneously argue for contractual

21

protections.[14]  *Cf. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001)* ("To allow [a non-signatory] to claim the benefit of the contract and simultaneously avoid its burdens would … disregard equity... ." (internal quotation marks omitted)).

The Appellants argue that the District Court's reasoning is grounded in an erroneous belief that the gist-of-the-action doctrine can apply only to a contract's signatories, in contravention of our decision in *Addie v. Kjaer.  See* 737

---

[14] In pertinent part, the Court held that,

[Appellants] do not assert that they are in contractual privity with [Pollara] by virtue of the entrance/gate agreement. To the contrary, they affirmatively disown the written agreement, arguing that the contracting parties are not defendants to this action, and that [Pollara] ha[s] not sued "either of the two parties with which they contracted." Indeed, in their affidavits, they disavow taking action on behalf of the contracting non-parties. Accordingly, accepting these representations, [Pollara] cannot sue them pursuant to the written contract; the contract does not define these parties' respective rights and duties.

*Frank [C.] Pollara Grp. LLC v. Ocean View Inv. Holding, LLC*, No. 9-60, 2013 WL 171087, at *3 (D.V.I. Jan. 10, 2013).

F.3d at 868-69 ("Although D'Amour was not a party to the contracts, the Buyers cannot detach D'Amour from his status as agent for Premier. ... We therefore hold that the gist of the action doctrine bars the tort claims Buyers asserted against D'Amour, all of which were based upon conduct that allegedly breached the contracts."). It is the Appellants, though, who are laboring under a misperception. They claim to be entitled to the benefit of the gist-of-the-action defense because somewhere in the factual mix of the case there was a contract, even though Pollara claimed it did not govern the disputes in question and the Appellants actively disavowed it. The Appellants are wrong, and *Addie* is no support for their position. In *Addie*, we made a "factually intensive inquiry" into the contracts at issue and the relationships between the parties and concluded that, although a particular litigant was not a signatory to the contract, he was the sole principal and shareholder for the signatory and thus was both bound and protected by the contracts. *Id.* at 867-69. *Addie* does not stand for the proposition that a plaintiff who has entered into a contract is barred from bringing tort claims against a third party who disclaims the contract, nor does it suggest that whether someone is bound by a contract is a purely legal question. On the contrary, *Addie* reaffirms that whether a contract governs a particular dispute is often a "factually intensive" question. *Id.* at 868. Indeed, that is one reason why a number of district courts in this Circuit have been rightly reluctant to apply the gist-of-the-action doctrine when the existence of a contract is still in controversy.[15]

---

[15] *See M.H. Rydek Elecs., LLC v. Zober Indus., Inc.*, No. CIV.A.07-3885, 2007 WL 3407130, at *3 (E.D. Pa. Nov. 15, 2007) (gist-of-the-action doctrine does not apply where existence of contract is unsettled); *see also Bengal*

In the present case, the existence of contractual privity depends on certain predicate facts which, contrary to the Appellants' contentions, were vigorously disputed. Pollara claimed that the contract at issue did not extend to extra work he performed based on the Appellants' misrepresentations. The Appellants' argument, embodied in their summary judgment motion, was that Cheng and DuBois were not responsible for the conduct of the mortgage lender, Ocean View, and the mortgage holder, Southgate Crossing, LLC. The scope of the contract and the degree to which Cheng and Dubois pulled the strings of the entity-Appellants were fact questions bearing on the issue of contractual privity, and Pollara argued as much in opposing summary judgment. The District Court heard those competing arguments and ruled that the Appellants were not entitled to invoke the gist-of-the-action defense because they insisted that they were not bound by the contract. We are bound to note simply that the Appellants failed to preserve their objections to the District Court's summary judgment ruling with motions for judgment as a matter of law under Rule 50, and they thus have lost their ability to raise them now.

---

*Converting Servs., Inc. v. Dual Printing, Inc.*, No. CIV.A. 11-6375, 2012 WL 831965, at \*4 (E.D. Pa. Mar. 13, 2012) (suggesting that denial of contract's existence would be sufficient to defeat gist-of-the-action defense); *DeAngelo Bros., Inc. v. Long*, No. 4:05-CV-0800, 2005 WL 1309037, at \*4 (M.D. Pa. June 1, 2005) (gist-of-the-action inapplicable where contract is in question).

## B.     Inconsistent Verdicts

The Appellants also complain that the jury's verdict was inconsistent because its finding of intentional misrepresentation by Cheng precludes a finding of negligent misrepresentation by OMEI.  As already noted, the jury was asked to decide the degree of fault for Ocean View, OMEI, Cheng, and Dubois with respect to five different subjects, indicating whether there was an intentional misrepresentation, negligent misrepresentation, or no misrepresentation at all with respect to each of those subjects.[16]  The Appellants argue that, because the jury assigned different degrees of fault to different actors, the verdict was irreparably inconsistent.

Under Rule 49, a jury may render either a general verdict or a special verdict.[17]  A general verdict is a "verdict

---

[16] As explained *supra* at 11-12, the five subjects about which the Appellants had purportedly made misrepresentations were: (1) the original building permit for the entrance, (2) the additional work for the entrance, (3) the roadway repair work, (4) various permits for construction of group dwellings, and (5) the proposals for the development plan.  (App. at 5.)

[17] Rule 49 provides, in pertinent part, that

The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.  The court may do so by:  (A) submitting written questions susceptible of a categorical or other brief answer; (B) submitting written forms of the

by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions." Black's Law Dictionary 1555 (10th ed. 2014). By contrast, a "special verdict" is a form where the jury answers only "special written finding[s] on each issue of fact." Fed. R. Civ. P. 49(a)(1). The jury's sole function is to determine the facts; the jury needs no instruction on the law because the court applies the law to the facts as found by the jury. *See Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1521 (6th Cir. 1990) ("Where special verdicts are involved, the jury's sole function is to determine the facts; therefore, neither an instruction on the law nor a summary concerning their role in relation to the law was necessary."); *see also* 89 C.J.S. Trial § 773 (2015) ("If special issues are submitted or a special verdict is required, it is improper to instruct the jury on the law of the case."). A "general verdict with answers to written questions" is a hybrid form in which the jury is asked to

> special findings that might properly be made under the pleadings and evidence; or (C) using any other method that the court considers appropriate. ...
>
> The court may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide. The court must give the instructions and explanations necessary to enable the jury to render a general verdict and answer the questions in writing, and must direct the jury to do both.

Fed. R. Civ. P. 49(a)(1), (b)(1).

26

render a general verdict in conjunction with findings of fact. Fed. R. Civ. P. 49(b)(1). In other words, the jury is asked to decide mixed questions of law and fact, with the guidance of legal instructions. *Id.*; *see also McLaughlin v. Fellows Gear Shaper Co.*, 786 F.2d 592, 595 n.2 (3d Cir. 1986) (quoting requirements of Rule 49(b)); *Stanton by Brooks v. Astra Pharm. Prods., Inc.*, 718 F.2d 553, 574-75 (3d Cir. 1983) (analyzing whether questions were submitted to jury under Rule 49(a) or (b)).

Here, the verdict form did not require the jury to make special written findings as to questions of fact, but rather asked the jury to check a box indicating whether a particular defendant was liable for misrepresentation, and, if so, based on what type of misrepresentation: negligent or intentional. Accordingly, it is best understood as a general verdict form with special questions. *See Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992) (form asking jury whether defendant was liable under each of four alternative theories constituted general verdicts on different legal theories). The District Court's instructions to the jury on the law to be applied to the factual findings, as well as the requirement that the jury apply the law and render its verdict, provide further support – and may conclusively establish – that this was a general verdict. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) (Rule 49(a) special verdict rule is inapplicable when a jury is required to make a determination of ultimate liability as well as to determine facts).

Our court has never expressly decided whether the failure to object to an inconsistency in a general verdict before the jury is discharged results in a waiver of the objection. In *Simmons v. City of Philadelphia*, Judge Becker

27

predicted that, "[i]n this circuit, it probably is necessary, as it is in the majority of the circuits, to raise prior to the jury's dismissal an objection based on the inconsistency of the answers to interrogatories supporting a general verdict rendered under Rule 49(b)." 947 F.2d 1042, 1056-57 (3d Cir. 1991). Later, in *Loughman v. Consol-Pennsylvania Coal Company*, we noted that we did not need to decide whether to adopt that "tentative conclusion" from *Simmons* because the verdict in *Loughman* was not inconsistent. 6 F.3d 88, 104 n.15 (3d Cir. 1993). Here, it is uncontested that the Appellants failed to object either to the wording on the verdict form – indeed, they joined in proposing it – or to the responses provided by the jury before the jury was discharged. Therefore, fulfilling Judge Becker's prediction, we today join a number of our sister circuits and hold that, if a party fails to object to an inconsistency in a general verdict before the jury is excused, that party waives any objection in that regard.[18] Having decided that, we choose not to consider

---

[18] *See, e.g.*, *Fencorp, Co. v. Ohio-Ky. Oil Corp.*, 675 F.3d 933, 944 (6th Cir. 2012) ("Defendants failed to raise th[e] argument that the jury's verdict was internally inconsistent before the jury was discharged and, consequently, have waived this objection."); *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1419 (11th Cir. 2011) ("We have held that if the party challenging this type of verdict has failed to object before the jury is discharged, that party has waived the right to contest the verdicts on the basis of alleged inconsistency." (internal quotation marks omitted)); *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.");

whether there is any inconsistency in the verdict. Because the Appellants failed, before the jury was discharged, to object to the inconsistency they believed was inherent in the general verdict, they have waived that objection under Rule 49.[19]

---

*Chem-Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir. 2002) ("[T]o the extent Chem-Trend claims an inconsistency in the verdicts, Chem-Trend waived the challenge by failing to object before the district court discharged the jury."); *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63 (1st Cir. 2002) ("We have held that under Rule 49(b), objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged."); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 726 (4th Cir. 1999) ("[A] litigant's failure to raise an inconsistency before the jury is discharged renders Rule 49(b) inapplicable and thus precludes that litigant from relying upon the inconsistency to challenge an adverse disposition."); *Bonin v. Tour W., Inc.*, 896 F.2d 1260, 1263 (10th Cir. 1990) ("If a party fails to object before the jury is discharged, he waives any future challenge to the inconsistency because his failure to make a timely objection deprives the court of the option of sending the jury back for further deliberations."). *Cf. Hundley v. District of Columbia*, 494 F.3d 1097, 1103 (D.C. Cir. 2007) (holding that the plaintiff did not waive its inconsistency objection because it "repeatedly objected at trial to the proposed written interrogatory").

[19] The Appellants may also have waived their inconsistency-challenge pursuant to Rule 51 by failing to raise any objection to the content of the jury instructions and verdict form, both of which authorized the jury to make the findings that Appellants now complain are inconsistent. *See*

## III.    Conclusion

The District Court's denial of summary judgment is not reviewable. In all other respects, we will affirm the rulings of the District Court.

---

Fed. R. Civ. P. 51 (addressing objections to jury instructions); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 312 n.21 (3d Cir. 2007), *as amended* (Aug. 28, 2007) (stating that there is a "strong case" that appellants waived any objection to inconsistency in verdict by failing to object to verdict form, but concluding that the verdict was consistent and thus that the panel need not decide the issue); *Kosmynka*, 462 F.3d at 84-85 ("Waiver of an objection to an inconsistent verdict has been found ... when the inconsistency was caused by an improper jury instruction or verdict sheet and there was no objection to either the instruction or verdict sheet prior to submission of the case.").