**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1687
_____

CEVDET ASKÜT VE OĞULLARI KOLL, STI,

v.

HUSEYIN CAVUSOGLU,
                                        Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-12-cv-02899)
District Judge:  Honorable William J. Martini

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
July 11, 2017

Before:  AMBRO, KRAUSE and NYGAARD, <u>Circuit</u> <u>Judges</u>

(Opinion filed: July 11, 2017)
_____

OPINION[*]
_____

PER CURIAM

Huseyin Cavusoglu appeals from the District Court's entry of final judgment,

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

following a jury verdict, against him and in favor of Cevdet Asküt Ve Oğullari Koll, STI ("Cevdet"). We will affirm.

I.

This case arises from the parties' dealings in the international market for Turkish food products. Cevdet is a Turkish company that sells and exports such products, and Cavusoglu owned several American companies that imported them. One such company was HGC Commodities Corporation ("HGC"), a now-dissolved New Jersey corporation. Cevdet and HGC began doing business in 2009. Cevdet initially sent two shipments to HGC on a "cash-against-documents" basis that required HGC to pay for the shipments before their release from customs, which HGC did. Cavusoglu, however, then convinced Cevdet to send 13 shipments totaling approximately $1.1 million worth of dried apricots and pine nuts to HGC on an open account basis without requiring any security. HGC received and sold the goods but never paid Cevdet.

Cevdet filed suit against Cavusoglu and HGC alleging, among other things, that they fraudulently induced it to make the $1.1 million shipments. That suit resulted in a settlement under which Cavusoglu and HGC agreed to make certain payments to Cevdet. The settlement agreement provided that, if Cavusoglu and HGC defaulted, then Cevdet could reinstate its claims against Cavusoglu and file a confession of judgment against HGC for the approximate $1.1 million amount. Cavusoglu and HGC defaulted, and the District Court entered a $1.1 million judgment against HGC only.

Cevdet later filed the action at issue here against Cavusoglu. Cevdet asserted

2

several claims under New Jersey law, including a claim for fraud and a claim to pierce HGC's corporate veil and hold Cavusoglu personally liable for the $1.1 million judgment. On the parties' cross motions for summary judgment, the District Court allowed Cevdet's claims for fraud and veil-piercing to proceed. The District Court later granted in part and denied in part the parties' pre-trial motions in limine, and the case proceeded to a jury trial. After Cevdet rested, Cavusoglu orally moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). He orally renewed the motion under Rule 50(b) after the close of evidence, and the District Court took it under advisement.

The jury then returned a verdict in favor of Cevdet on both claims. On Cevdet's claim for fraud, the jury found Cavusoglu liable for approximately $1 million but also found that Cevdet was 20% at fault under New Jersey's Comparative Negligence Act.[1] N.J. Stat. § 2A:15-5.2. Thus, the District Court entered judgment in favor of Cevdet for approximately $800,000 on its fraud claim and approximately $1 million on its veil-piercing claim. Because both claims sought compensation for the same injury, however, the District Court entered a total judgment for approximately $1 million plus interest. Cavusoglu appeals. He was represented by counsel in the District Court but has filed his brief on appeal pro se.[2]

---

[1] Application of the Act to Cevdet's fraud claim is not at issue on this appeal, but we note that New Jersey courts have applied the Act to intentional torts as well. See Martin v. Prime Hosp. Corp., 785 A.2d 16, 20 (N.J. Super. Ct. App. Div. 2001) (citing Blazovic v. Andrich, 590 A.2d 222 (N.J. 1991)).

[2] Cevdet argues that a lawyer must have ghostwritten Cavusoglu's brief and that we should thus "deny" his appeal for "lack of candor." We deny that request, but we do take

II.

The District Court had diversity jurisdiction under 28 U.S.C. § 1332 and, to the

extent that we have jurisdiction, it is under 28 U.S.C. § 1291.  Cavusoglu challenges the

District Court's orders:  (1) denying in part his motion for summary judgment (ECF No.

75); (2) denying in part his motion in limine (ECF No. 113); (3) denying his Rule 50(b)

motion (ECF No. 131); and (4) entering final judgment (ECF No. 132).  Cavusoglu raises

nine specific challenges, which we will address in three categories.  We conclude that all

of them lack merit.

### A.    Substantive Challenges

Cavusoglu frames his substantive challenges as challenges to both the denial of

summary judgment and the denial of his Rule 50(b) motion.  We lack jurisdiction to

review the order denying summary judgment except to the extent that it was based on a

"'a purely legal issue' capable of resolution 'with reference only to undisputed facts.'"

Frank C. Pollara Gp., LLC v. Ocean View Inv. Holdings, LLC, 784 F.3d 177, 185 (3d

Cir. 2015) (quoting Ortiz v. Jordan, 562 U.S. 180, 190 (2011)).  Only the last of the

substantive challenges addressed below arguably qualifies.  We decide all other issues on

the basis of the trial record, provided that Cavusoglu preserved them in his Rule

50(b) motion.  See id. at 186-88.[3]

---

notice that Cavusoglu is an experienced litigant and sophisticated businessman who has
been able to draw on his counseled filings and arguments in the District Court.

[3] Our review of the denial of a Rule 50(b) motion is plenary.  See Trabal v. Wells Fargo
Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001).  A Rule 50(b) motion may be
granted "only if, as a matter of law, the record is critically deficient of that minimum

1.  Fraud

Cavusoglu raises three substantive challenges to Cevdet's claim for fraud, which required it to prove, inter alia, that Cavusoglu made a misrepresentation on which it reasonably relied. See Banco Popular N. Am. v. Gandi, 876 A.2d 253, 260 (N.J. 2005).

First, Cavusoglu argues that Cevdet, in deciding to make the $1.1 million shipments, relied "entirely" on the representations of a third party named Aret Museoglo over whom he had no control. Cevdet's Sales and Marketing Director, Oguz Kanyilmaz, testified that Museoglo spoke highly of Cavusoglu and suggested that Cevdet do business with him. (App'x at 118-19; ECF No. 136 at 83-84.) In particular, Kanyilmaz testified that Museoglo made representations (which proved to be false) that Cavusoglu was trustworthy, had his own distribution facilities, and controlled 70-80% of the market for dried apricots in the United States. (App'x at 118-22; ECF No. 136 at 83-87.)

Kanyilmaz also testified, however, that Cavusoglu himself later repeated those representations, that he made others of his own about such things as HGC's distribution capacity and its ability and intent to pay, and that Cavusoglu's own representations ultimately convinced Cevdet to make the $1.1 million shipments. (App'x at 124-30, 135-39, 178, 181-83, 193; ECF No. 136 at 89-95, 100-04; ECF No. 137 at 18, 21-22, 33.) Thus, although Kanyilmaz testified that he relied in part on Museoglo's representations,

---

quantity of evidence from which a jury might reasonably afford relief." Id. (quoting Powell v. J.T. Posey Co., 766 F.2d 131, 133-34 (3d Cir. 1985)). In making that determination, "we view the evidence in the light most favorable to the non-moving party and give that party the advantage of every fair and reasonable inference." Frank C. Pollara Gp., LLC, 784 F.3d at 184 n.9. We also refrain from weighing evidence and determining credibility, which are functions of the jury. See id.

his testimony presented sufficient evidence that Cevdet relied on misrepresentations that Cavusoglu made himself. See Eisenberg v. Gagnon, 766 F.2d 770, 779 (3d Cir. 1985) (holding that evidence of reliance on a report was sufficient even though there was evidence that plaintiffs may also have relied on a another source); Byrne v. Weichert Realtors, 675 A.2d 235, 241-42 (N.J. Super. Ct. App. Div. 1996) (holding that similar circumstance created question of fact for the jury).

Second, Cavusoglu argues that Cevdet could not have relied on his representations in making the $1.1 million shipments because (1) Cevdet previously made two smaller shipments on a "cash-against-documents" basis, and (2) Kanyilmaz testified that switching to an open account business was a common practice in the industry. Cavusoglu raised the first aspect of this argument in his motion for summary judgment, but we lack jurisdiction to review it to that extent because whether Cevdet actually relied on Cavusoglu's representations is not a pure issue of law. See Frank C. Polara Gp., Ltd., 784 F.3d at 185; Byrne, 675 A.2d at 241-42. Cavusoglu did not raise either aspect of this argument in his Rule 50(b) motion. Thus, we do not review it. We nevertheless note that the evidence of Cevdet's actual reliance was sufficient as discussed above.

Third, Cavusoglu argues that Cevdet's reliance on his representations was unreasonable. Kanyilmaz testified that, before Cevdet did business with HGC, he took various steps to verify Cavusoglu's representations, including by consulting with others in the industry who were familiar with Cavusoglu and HGC, confirming that HGC had a shipping contract, and researching HGC on the Internet. (App'x at 125-26, 176-77; ECF No. 136 at 90-91; ECF No. 137 at 16-17.) Kanyilmaz further testified that, when

Cavusoglu proposed switching to an open account basis, Kanyilmaz discussed the matter with his boss and they agreed that it was reasonable to do so in light of what they thought they knew about Cavusoglu and because it was a common way of doing business in the industry. (App'x at 129; ECF No. 136 at 94.) Kanyilmaz conceded on cross-examination that he did not ask Cavusoglu to provide financial statements verifying HGC's financial condition, but he testified that it was not culturally appropriate to do so. (App'x at 180; ECF No. 137 at 20.)

Cavusoglu argues that Kanyilmaz should have requested the statements anyway and should have taken various other measures to protect its interests before shipping $1.1 million worth of goods on an open account. Cavusoglu relies primarily on Allesandra v. Gross, 453 A.2d 904 (N.J. Super. Ct. App. Div. 1982), but that case is inapposite. In Allesandra, the plaintiffs delivered goods on an open account to a company that proved unable to pay for them. See id. at 905-06. Plaintiffs later sued the company's president for fraud on the ground that he induced the deliveries by failing to disclose the company's financial condition. See id. at 906. The court held that the president had no duty to disclose the company's financial condition because the plaintiffs could have availed themselves of various commercial safeguards. See id. at 906-07.

In this case, by contrast, Cavusoglu did not merely fail to disclose HGC's financial condition. Instead, he affirmatively misrepresented (among other things) HGC's ability and intent to pay. New Jersey courts have distinguished Allesandra on that basis because "[t]he law should not permit . . . principals of failing corporations to defraud suppliers of goods and credit with impunity by misrepresenting the financial condition of the

7

corporation and its intentions toward its creditors." Van Dam Egg Co. v. Allendale

Farms, Inc., 489 A.2d 1209, 1212 (N.J. Super. Ct. App. Div. 1985). Cevdet also took

some steps to verify Cavusoglu's representations. Whether Cevdet's reliance on those

representations was reasonable under the circumstances was a question of fact for the

jury. See id. at 1211. Cevdet presented sufficient evidence for the jury to conclude that it

was. See Walid v. Yolanda for Irene Couture, Inc., 40 A.3d 85, 91-93 (N.J. Super. Ct.

App. Div. 2012) (holding that plaintiffs proved reasonable reliance even though there was

more they could have done to discover the fraud).[4]

### 2. Piercing the Corporate Veil

Cavusoglu raises two substantive challenges to the piercing of HGC's corporate

veil. He did not raise any such challenge in his Rule 50(b) motion, but his first challenge

overlaps with those discussed above, and his second, which he raised on summary

judgment, can be construed as raising a pure issue of law.

First, Cavusoglu argues that Cevdet did not prove an element of this claim. A

corporate veil may be pierced under New Jersey law only when, inter alia, the defendant

used the corporation "to perpetrate a fraud or injustice." Craig v. Lake Asbestos of

Quebec, Ltd., 843 F.2d 145, 149 (3d Cir. 1988) (quoting N.J. Dep't of Envtl. Prot. v.

Ventron Corp., 468 A.2d 150, 164 (N.J. 1983)). Cavusoglu argues that, because Cevdet's

---

[4] Cavusoglu asserts that the jury's decision to assign some comparative fault to Cevdet on this claim means that its reliance on his representations could not have been reasonable. We will not address this issue because Cavusoglu did not raise it in the District Court and because he has not adequately developed it on appeal.

fraud claims fails, its claim to pierce the corporate veil fails as well. Cevdet's fraud claim does not fail as discussed above.

Second, Cavusoglu argues that Cevdet's attempt to pierce HGC's corporate veil is really a claim for "creditor fraud" like the one that the New Jersey Supreme Court rejected in Banco Popular, 876 A.2d 253. In that case, a bank obtained a judgment against a debtor, but the debtor transferred his assets on his attorney's advice and the transfer left him unable to satisfy the bank's judgment. See id. at 257-58. The bank then filed suit against the attorney and asserted a claim for "creditor fraud," which it argued it could bring even though the attorney did not make any representations to the bank and the bank did not rely on any. See id. at 260. The court rejected that argument because "[m]isrepresentations and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." Id. at 261. The court held, however, that the attorney could be liable for conspiring to violate New Jersey's Uniform Fraudulent Transfers Act ("UFTA"). See id. at 263-64.

Cavusoglu argues that, under Banco Popular, his fraud does not state a basis to pierce the corporate veil and Cevdet's remedy, which it is pursuing elsewhere, lies under the UFTA instead.[5] Cavusoglu raised this argument in his motion for summary judgment, but the District Court did not expressly address it. To the extent that this argument raises a pure issue of law, it lacks merit. Banco Popular did not address a claim

---

[5] Cevdet filed a separate action against Cavusoglu and numerous persons and entities to whom he allegedly transferred HGC's assets. That action is pending at D.N.J. Civ. No. 2-14-cv-03326. Cavusoglu filed a motion to consolidate the two actions, but the District Court denied it and Cavusoglu has not challenged that ruling on appeal.

to pierce a corporate veil. Instead, it rejected an attempt to assert a fraud claim in the absence of misrepresentation and reliance. Cevdet proved those elements as part of its claim of fraud, and Cavusoglu's use of HGC to perpetrate that fraud supported the jury's decision to pierce HGC's corporate veil. That decision renders Cavusoglu personally liable for Cevdet's judgment against HGC. The fact that Cevdet can pursue relief from Cavusoglu's alleged efforts to frustrate collection of that judgment does not preclude his liability for the judgment itself, and nothing in Banco Popular suggests otherwise.

B.    Evidentiary Challenges and Trial Errors[6]

Cavusoglu raises three challenges to the admission of evidence at trial and some related claims of trial error. Cavusoglu first challenges the admission of evidence that, before his dealings with Cevdet, other companies filed suit and obtained settlements or judgments against him and his former businesses. This challenge has two aspects.

First, Cavusoglu argues that this evidence was not admissible at all. He moved in limine to exclude this evidence, but the District Court denied that motion because it concluded that this evidence was relevant to both of Cevdet's claims. (App'x at 24-25; ECF No. 112 at 4-5.) Cavusoglu does not acknowledge the District Court's reasoning or

_____

[6] We review evidentiary challenges for abuse of discretion, and evidentiary errors do not require a new trial unless they affect a party's "substantial rights." Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir. 2000) (citing, inter alia, Fed. R. Evid. 103(a) and Fed. R. Civ. P. 61). When a party does not object in the District Court, however, we review the issue only for plain error. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 517 (3d Cir. 1997); Fed. R. Evid. 103(e). The same applies to challenges to jury instructions and to arguments made by counsel. See Lesende v. Borrero, 752 F.3d 324, 336 (3d Cir. 2014); Dunn v. HOVIC, 1 F.3d 1371, 1377, 1379 (3d Cir. 1993) (en banc).

10

raise anything calling it into question, and the District Court did not abuse its discretion for the reasons it explained.[7]

Second, Cavusoglu argues that Cevdet improperly presented this evidence at trial. In denying Cavusoglu's motion in limine, the District Court noted that this evidence should not be introduced to show Cavusoglu's propensity to defraud. Cavusoglu argues that Cevdet's counsel did just that. Cavusoglu argues that counsel raised propensity arguments during his opening argument, but he did not object to them. (App'x at 64-68; ECF No. 136 at 29-33.) Cavusoglu also argues that counsel pursued improper lines of questioning, but the portions of the transcripts that he cites reveal only one instance in which he objected. The District Court <u>sustained</u> that objection and also sua sponte directed the jury to disregard testimony about a certain complaint. (App'x at 261; ECF No. 137 at 101.) Cavusoglu nevertheless asserts that the District Court should have given a limiting instruction or declared a mistrial, but he requested neither form relief in the District Court. <u>See</u> <u>Lesende</u>, 752 F.3d at 334. Regardless, even if some isolated comments may have suggested a propensity, we are satisfied that they "did not so pervade the trial as to render the verdict a product of prejudice." <u>Draper v. Airco, Inc.</u>, 580 F.2d 91, 96 (3d Cir. 1978). Thus, we perceive no basis for relief in this regard.

Cavusoglu's second challenge is to testimony that Kanyilmaz gave regarding HGC's capitalization. HGC's capitalization was relevant because "gross

---

[7] Cevdet appears to suggest that we may not review this issue because Cavusoglu stipulated to the admission of this evidence in the District Court. Cavusoglu did so only after the District Court unequivocally denied his motion in limine. Thus, he was not required to object again to preserve this issue for review. <u>See</u> <u>Walden</u>, 126 F.3d at 518.

11

undercapitalization" weighs in favor of piercing the corporate veil. Craig, 843 F.2d at 150. Kanyilmaz testified that, if HGC's business were really as extensive as Cavusoglu represented it to be, then HGC would require capitalization of at least $50 million. (App'x at 121; ECF No. 136 at 86.)

Cavusoglu objected to this line of questioning in the District Court (id.), but he did not specify on what basis and has not developed any specific challenge on appeal. Cavusoglu appears to argue that Kanyilmaz's lay opinion was not properly supported. See Fed. R. Evid. 701. Cevdet counters that Kanyilmaz's opinion was properly supported by his experience in the industry. We need not address this issue because, even if there were any preserved error in this regard, any such error would be harmless. Cavusoglu's own testimony was hopelessly contradictory regarding whether he even capitalized HGC at all.[8] Cevdet focused on that testimony at closing (App'x at 596; ECF No. 139 at 132), and neither party mentioned Kanyilmaz's testimony on this point. Cavusoglu also did not argue that HGC was properly capitalized and instead argued merely that undercapitalization by itself is not enough to pierce the corporate veil. (App'x at 614-16; ECF No. 139 at 150-51.) Thus, it is highly unlikely that this testimony affected the outcome of the case. See Becker, 207 F.3d at 180.

---

[8] Cavusoglu testified variously: (1) that he did not capitalize HGC because it did not require capitalization in order to run; (2) that he did capitalize it with loans he obtained by mortgaging his houses; but (3) when pressed on a timing discrepancy, that he might have put that money into one of his other companies called CMC Trading instead. (App'x at 273-75, 317-18, 320, 403, 405-06; ECF No. 137 at 113-15; ECF No. 138 at 28-29, 31, 115, 117-18.) Cavusoglu testified inconsistently on this point even under questioning by his own counsel.

Cavusoglu's third challenge is to Kanyilmaz's testimony (referenced above) that Museoglo told him certain things about Cavusoglu. Cavusoglu argues that Museoglo's statements to Kanyilmaz were inadmissible hearsay. Cavusoglu did not object to this testimony before the District Court, however, and we perceive no error (plain or otherwise) because Museoglo's statements to Kanyilmaz were not hearsay. Cevdet offered those statements not for their truth (to the contrary, it claimed that they were false), but to help explain why it agreed to make the $1.1 million shipments to HGC. See Fed. R. Evid. 801(c)(2).

### C.    Comparative Fault and Damages

Cavusoglu's final argument is based on the jury's finding that Cevdet was 20% at fault on its fraud claim. The District Court reduced the jury's finding of liability for fraud by 20% on that basis, but it ultimately imposed the full amount of liability because Cavusoglu remained liable for Cevdet's previous $1.1 million judgment against HGC on a veil-piercing theory. Cavusoglu argues that the District Court should have reduced the amount awarded under that theory by 20% as well. We will not address this issue because Cavusoglu did not raise it in the District Court and because he has not adequately developed it on appeal. We note, however, that the veil-piercing inquiry focused solely on Cavusoglu's own conduct, not Cevdet's. See Craig, 843 F.2d at 149-50. Cavusoglu cites no authority for the proposition that New Jersey's Comparative Negligence Act applies to veil-piercing claims, and we are aware of none.

### III.

For these reasons, we will affirm the judgment of the District Court.